The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Richard HEARTY, Defendant-Appellee.

The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Antonio AMEZQUITA,
Defendant-Appellee.

The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

David IDEN, Defendant-Appellee.
(Two cases).

Nos. 81SA539–81SA542.

Supreme Court of Colorado,
En Bank.

April 19, 1982.

Alexander M. Hunter, Dist. Atty., Peter Michael Maguire, Deputy Dist. Atty., Alan R. Beckman, Thomas M. O'Rourke, Sp. Deputy Dist. Attys., Boulder, for plaintiff-appellant.

No appearance for defendant-appellee Hearty.

Lee Allen Hawke, Boulder, for defendant-appellee Amezquita.

Arthur M. Schwartz, Denver, for defendant-appellee Iden.

QUINN, Justice.

Pursuant to C.A.R. 4.1 the People in this interlocutory appeal challenge a suppression ruling entered in the course of a pending criminal case in which the defendant-appellees, David Iden, Richard Hearty and Antonio Amezquita, have been charged by indictment with criminal extortion,[1] theft,[2] and conspiracy to commit extortion,[3] during the period between March 8 and March 25, 1981. The evidence suppressed by the district court was seized pursuant to search warrants from the residence of Iden and from the office of an attorney who previously represented Iden and Hearty.[4] The

---

1. Section 18–3–207, C.R.S.1973 (1981 Supp.).

2. Section 18–4–401(1)(a), (2)(d) and (4), C.R.S.1973 (1978 Repl. Vol. 8).

3. Section 18–2–201, C.R.S.1973 (1978 Repl. Vol. 8).

4. During the execution of the search warrant for the Iden residence, Iden was arrested and cocaine was seized from his person. He was charged by separate information with possession of cocaine, sections 12–22–302 and 12–22–322(2)(b), C.R.S.1973 (1978 Repl. Vol. 5), and filed a motion to suppress the cocaine. The district court consolidated for hearing all motions to suppress filed in both cases and entered one ruling addressing all issues. Although separate interlocutory appeals were

district court suppressed the evidence seized from Iden's residence on the grounds that there was not probable cause for the issuance of the warrant, the information in the affidavit was stale, and the seizure of a leather pouch containing cocaine and drug paraphernalia was not within the plain view exception to the warrant requirement.[5] The court also suppressed client files and other documents seized from the attorney's office on the basis that they were outside the scope of the property described in the warrant.[6] We conclude that the court erred in suppressing the evidence seized from the Iden location but properly suppressed the client files and other documents seized from the attorney's office.

### I. *Facts*

In early May 1981 Detective Hayes and Sergeant Spotts of the Boulder Police Department were investigating an extortion scheme which had been reported to them on May 6, 1981, by Kevin Engel and his wife, Holly Engel. According to the affidavit of Detective Hayes, which was filed in support of subsequently issued search warrants, the Engels described the following events. On March 8, 1981, Richard Hearty and Antonio Amezquita contacted Kevin Engel at his Boulder home and accused him of stealing $300,000 from Hearty's residence the previous October. Although Engel denied the theft, Hearty and Amezquita told him that if he did not return $200,000 of the money, his life as well as those of his wife, his two children and his parents would be in jeopardy. The affidavit of Detective Hayes describes these threats as follows:

"Mr. Engel advised that 'Tony' [Amezquita] then stated, 'You can go to the police and they may look in on your families and stuff for a while, but sooner or later we're going to get somebody

alone and you're going to be awfully unhappy that you made that decision.'

"Mr. Engel stated, at that point, he thought that he wasn't dealing with normal people so he continued to talk with 'Tony'. Mr. Engel then asked 'Tony' what he 'Tony' wanted him to do, and that he did have some money.

"Mr. Engel stated that 'Tony' and Richard Hearty then advised him that Richard Hearty had been ripped off for Three Hundred Thousand Dollars that belonged to a Central American organization and that they wanted it back. Mr. Engel stated that he was also advised by 'Tony' that the people involved were 'Mafia types' and they would stop at nothing to make anyone pay for it. Mr. Engel further stated that 'Tony' and Richard Hearty advised him that if he did not do something today (Sunday, March 8, 1981) and give them some kind of earnest money, they were going to start knocking off people in his family. Mr. Engel further stated that 'Tony' and Richard Hearty also threatened a friend of his . . . .

"When asked by Sgt. Spotts to get more specific [with reference to] the threats made to him by 'Tony' and Mr. Hearty, Mr. Engel stated that they both said the following: 'These people from Central America want their money, they don't stop at anything. They'll kill you in a parking lot. It doesn't matter, Safeway, King Soopers, they'll gun you down. If you try to give them any shit, they will first take and break your kid's legs and your arms and legs and then your wife's. They will shoot them, and then they will kill you before they do any . . . they are not just going to let you get by with dying.'"

taken, we have ordered the cases consolidated for the purpose of this appeal.

5. The court denied Iden's motion to suppress the cocaine seized from his person in a search incident to arrest. The court also denied the motion to suppress evidence seized from Iden's place of business and additional evidence seized from the residences of Hearty and Amezquita. Under C.A.R. 4.1, this interlocutory appeal is limited to that part of the ruling

which suppressed certain evidence. The court's ruling denying the suppression of other evidence is not before us at this time.

6. The court denied the motion to suppress a rubber stamp seized from the attorney's office, concluding that it was within the scope of the search warrant. This aspect of the court's ruling is not before us at this time.

In response to those threats Engel paid Hearty $43,220 in cash on March 8. He paid $12,000 in cash to Hearty and Amezquita on March 9. Shortly thereafter Engel and his wife signed over the titles to three of their vehicles to Hearty and Amezquita. In exchange for the title to one of the vehicles, a 1980 Porsche, Engel was credited with $22,000. Mrs. Engel was later able to talk Hearty and Amezquita into returning the two other vehicles. The Engels subsequently made cash payments to Hearty and Amezquita in the amounts of $14,000 on March 10, $19,000 on March 11, and $11,000 on March 12. Between March 15 and 25 the Engels endorsed $27,000 in checks from their New York stock broker to Hearty and Amezquita. Mrs. Engel told the officers that she signed the checks at her bank, which guaranteed her signature. Amezquita had told her that he was going to New York to cash the checks in order to avoid running them through his own account.

Engel and his wife had observed several persons in different automobiles watching their residence at various times throughout the month of March and on one of these occasions a person was seen taking photographs of their home. Mr. Engel noticed that several of the suspect vehicles had license plates with the letters "RR" on them. When he later asked Amezquita about these license plates, Amezquita advised him that they were rental plates and the person in one of the vehicles had a sawed-off shotgun. Amezquita further advised Engel at this time that both Engel and his wife "were being watched for their protection as they thought the Central American guys were going to kill them...."

On April 25, 1981, Engel observed Amezquita driving the Porsche which Engel had transferred to him previously. The next day Engel telephoned Amezquita and demanded the return of the Porsche. Amezquita refused and in response to Engel's accusation that Amezquita was "scamming" him stated, "You've got that right pal."

On May 6, 1981, Detective Hayes and Sergeant Spotts interviewed Craig Skinner, a friend of Engel, and Skinner furnished them the following information. Richard Hearty, who was a friend of Skinner, told him that some $300,000 in cash and gems had been stolen from his apartment in September or October of 1980. Hearty had been holding the money for David Iden and did not report the theft to the police. Iden owned and operated the Colorado Gem Exchange in Boulder, and, according to Skinner, the stolen money and gems were the fruits of smuggling operations. In discussing the theft with Hearty, Hearty informed Skinner that a lawyer named "Sandy" had referred him to a private detective, Tony Amezquita. Skinner assisted Hearty and Amezquita in the initial investigation of the theft. On one occasion Skinner mentioned to Hearty the possibility that Engel might have been involved in the theft because he had been spending a lot of money recently. On May 4, 1981, Skinner discussed the Engel matter with Iden at the latter's office and Iden told him that these Central American people "are willing to come up and kill somebody." Iden on this occasion acknowledged that he knew of Engel's past payments of money to Amezquita and Hearty.

Detective Hayes and Sergeant Spotts thereafter contacted the Colorado Department of Revenue and learned that the 1980 Porsche with Engel's vehicle registration number had been registered to Antonio Amezquita. Further investigation by the officers established the respective residences of Iden, Hearty and Amezquita, as well as the location of Iden's gem business in Boulder.

On May 12, 1981 Detective Hayes applied for search warrants for the residences of Iden, Hearty and Amezquita, and also for the Colorado Gem Exchange operated by Iden. Judge Scott issued search warrants authorizing the officers to search for and seize the 1980 Porsche, title to the Porsche and any documents pertaining to the surveillance conducted on the Engels during the period of March 8 through March 21, 1981, including photographs, writings, and

rental car documents and billings pertaining to the vehicles used in the surveillance. The search warrant for Iden's residence was executed on the day of its issuance and officers seized $117,680 in cash, a notebook containing several entries pertaining to the Engels, a maintenance manual for a Porsche automobile, and an insurance bill addressed to Iden at his residence. During the search of Iden's home, a twelve by fifteen inch leather pouch was located in a bedroom. Upon opening it the searching officer saw suspected glass vials of cocaine and other narcotic paraphernalia which were then seized.

The Boulder Police Department also had been investigating the activities of a Boulder attorney, Sandra Younghans, in connection with the extortion scheme. On May 15, 1981, Detective Hayes submitted an affidavit for a warrant to search Younghans' office. The affidavit alleged that Younghans, who was a partner in Wollrab and Younghans, P. C., had admitted to Assistant District Attorney William Wise that she was the "Sandy" who had referred Hearty to Amezquita and that she later told Amezquita and Hearty to "ease up" on their threats to the Engels. The affidavit further alleged that Kevin Engel had examined the returned checks which he and his wife had signed over to Amezquita during March 1981, and observed that they had been endorsed with a stamp, "Pay to the order of First National Bank, Boulder, Colorado, for deposit only, Wollrab and Younghans, P. C., Trust Account 938159100." Based on this affidavit a search warrant was issued authorizing the search for and seizure of the following described property from the law office of Wollrab and Younghans:

"1) Any and all financial and/or bookkeeping records and/or ledgers pertaining to anyone of the following individuals: David Iden, Richard Hearty, Jr., Antonio Amezquita, or the Colorado Gem Exchange including cancelled checks, disbursement/receipt ledgers, deposit slips, bookkeeping records, records and ledgers for Wollrab and Younghans' Trust Account Number 938159100 with First National Bank of Boulder, and any other such financial bookkeeping records pertaining to the above named individuals and company.

"2) A rubber stamp bearing the words 'Pay to the order of First National Bank, Boulder, Colorado, for deposit only, Wollrab and Younghans, P. C., Trust Account 938159100.' "

The search warrant expressly provided that "[t]he execution of this Warrant is not to violate any attorney-client privilege as such may exist regarding any property not described above." In executing the warrant the officers seized the rubber stamp, a rent receipt book, one file marked "David Iden, Business," and two files marked "Richard Hearty." Detective Hayes admitted at the suppression hearing that the files seized were client files and it was not known at that time whether they contained any of the financial records described in the warrant. Upon seizing the files the officers placed them into a large evidence folder and sealed the folder.

Also located during the search was an eight by eleven inch manila envelope hidden under a board in a locked drawer of a credenza in Younghans' office. This envelope was unmarked. Upon looking inside to observe the general nature of the contents, Detective Hayes observed several smaller envelopes which were marked with colored dots, and also what appeared to be a report of some burglary investigation, the details of which are not further disclosed by the record. One of the smaller envelopes was opened and it contained a scrap of paper with the name "Craig Skinner" on it. The other envelopes also were marked with the names of various persons some of whom the detective associated with the extortion investigation. These other envelopes within the manila folder were not opened. The manila folder and its contents then were seized and sealed. Upon the completion of the search the sealed files and documents were turned over to Judge Scott.

On May 15, 1981, the Boulder County Grand Jury issued a subpoena *duces tecum* ordering Younghans to produce certain documents and memoranda.[7] Younghans moved to quash the subpoena and return all items seized from her office, asserting the attorney-client privilege and the work product doctrine. Judge Scott conducted a hearing on Younghans' motion and permitted attorneys for Iden and Hearty to intervene and assert the attorney-client privilege on their clients' behalf, based on Younghans' previous representation of them. While Judge Scott had Younghans' motion to quash under consideration, the grand jury on May 21 returned indictments against Iden, Hearty and Amezquita for criminal extortion, theft, and conspiracy to commit extortion. On July 20 Iden filed a motion to suppress items seized from Younghans' office on the asserted basis that the warrant failed to describe with particularity the place to be searched or the property to be seized and the searching officers engaged in a general exploratory search. Hearty and Amezquita subsequently joined in Iden's motion to suppress. After reviewing the documents seized from Younghans' office, Judge Scott denied the motion to quash as to most of the items because they were within the "crime-fraud exception" to the attorney-client privilege.[8] The remaining items were returned to Younghans as either privileged, irrelevant or unintelligible. Judge Scott, however, did not conduct a hearing or rule on the motion to suppress filed by Iden, Hearty and Amezquita.

On November 30 and December 1, 1981, a hearing was held on the motions to suppress before Judge Neighbors and testimony was received from Detective Hayes who had filed the affidavit and had participated in the searches. The court suppressed the objects seized from Iden's residence during the search of May 12, 1981, on the following grounds: the affidavit failed to allege probable cause to believe that the objects sought in the search were located on Iden's premises; the facts alleged in the affidavit were stale; and the suspected cocaine and other drug paraphernalia located within the leather pouch were not within the plain view exception to the warrant requirement.[9] The court also suppressed all items,

---

7. The record does not indicate the nature of the records sought by subpoena *duces tecum* from Younghans' office or whether the subpoena had been issued before or after the search of her office.

8. The "crime-fraud" or "criminal purposes" exception to the attorney-client privilege excepts from the privilege communications made for the purpose of aiding a present continuing crime or a future crime. *See, e.g., Caldwell v. District Court,* Colo., 644 P.2d 26 (1982) *A. v. District Court,* 191 Colo. 10, 550 P.2d 315 (1976).

9. In suppressing the evidence obtained from Iden's residence the court ruled, in pertinent part, as follows:

"There are ... statements contained in the affidavit which clearly support probable cause for the arrest of Mr. Iden. But the difficulties in the search and the search warrant with regard to the Iden residence are numerous.... The basic proposition is this: that a search warrant may properly issue only upon written affidavit establishing probable cause for the belief that the items sought are or will be located on the premises to be searched at the time in which the warrant is procured or within a reasonable time thereafter."

\* \* \* \* \* \*

"There simply is no basis at all to believe that the Porsche automobile was present on the premises nor [sic] that the Colorado vehicle title was present on the premises. According to the affidavit, the officer had observed the title had been issued by the Department of Revenue to Mr. Amezquita. The case that counsel cited yesterday is most instructive on the issue of probability as to place—probability as to a place problem when you have multiple defendants, and it's likely that one of the perpetrators of the alleged offense has possession of items which may be admissible in evidence.

\* \* \* \* \* \*

"It's obvious in this case that the officers did have information making it more likely that Mr. Amezquita and Mr. Hearty had the information in their possession.

\* \* \* \* \* \*

"A somewhat more difficult problem is presented by the photographs, writings, rental car documents and billings, but in view of the passage of time and more likely opportunity documents would be in the possession of defendants Amezquita and Hearty, there is simply no probable cause to believe that those items were present in the Iden residence. The discussion about surveillance

except the rubber stamp, seized from Younghans' law office during the search of May 15, 1981, because the warrant authorized the seizure of financial or bookkeeping records only, but the files and documents seized were clients' files which, not having been particularly described in the warrant, were therefore outside the scope of the warrant.[10]

The district attorney subsequently filed this interlocutory appeal. We address first the issues relating to the search of the Iden residence and then those connected with the search of the law office.

## II. *The Search of Iden's Residence*

### A.

The initial basis of the court's ruling suppressing evidence seized from Iden's residence was that the affidavit failed to allege probable cause for the search. In the court's view the affidavit disclosed that the officers had "information making it more likely that Mr. Amezquita and Mr. Hearty had the information in their possession," rather than Iden, and, therefore, "there is simply no probable cause to believe that those items were present in the Iden residence." We conclude that the court applied an unduly restrictive standard of probable cause in its suppression ruling.

■ The standard of probable cause seeks not only "to safeguard citizens from rash and unreasonable interferences with privacy" but also "to give fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1891 (1949). Probable cause is measured by "reasonableness," not by pure mathematical probability:

"Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' ... The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule." *Dunaway v. New York*, 442 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824, 836 (1979).

■ In a search pursuant to warrant the constitutional standard of probable cause requires that the affidavit allege sufficient facts to warrant a person of reasonable caution in the belief that contraband or evidence of criminal activity is located on

---

was conducted by the defendants Amezquita and Hearty and the alleged victim, the discussion regarding rental vehicles was carried on between the defendant Amezquita and the alleged victim Engel and, therefore, the police did have reason to believe that one of the perpetrators was more likely to be in possession of the requested information.

"The next problem in regard to the search at the Iden residence is the search of the ... bag in the bedroom which contained alleged narcotics. It was a warrantless search of the bag; it can be justified only if the people establish plain view. The officer candidly testified he didn't know whether the bag was open or not. The people have not met their burden and the evidence must be suppressed on that ground."

**10.** The pertinent part of the suppression ruling with respect to Younghans' law office states:

"There clearly was probable cause to obtain a search warrant for the stamp regarding the endorsement, 'Pay to the Order of First National Bank of Boulder, For Deposit Only, Wollrab and Younghans, Professional Corporation,' and the trust account and the number. In addition there was probable cause to obtain a search warrant to obtain financial or bookkeeping records which would be material evidence in the prosecution of a criminal case. However, in my view, the description of the items to be seized, namely the financial and bookkeeping records or ledgers, does not warrant the seizure of client files, which clearly these were, as indicated by the testimony of the officer.... The warrant was for seizure of bookkeeping records of the law firm related to the three individuals, it certainly did not authorize the seizure of the items seized by the police officers, and for that reason the client files and the envelope, which was seized from the locked cabinet, must be suppressed."

the premises to be searched. *See, e.g., United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *People v. Ball,* Colo., 639 P.2d 1078 (1982). In determining whether the constitutional standard has been satisfied, the affidavit must be interpreted "in a common sense and realistic fashion" and courts should not impose "technical requirements of elaborate specificity." *United States v. Ventresca, supra,* 380 U.S. at 108, 85 S.Ct. at 746, 13 L.Ed.2d at 689; *accord, People v. Ball, supra; People v. Lindholm,* 197 Colo. 270, 591 P.2d 1032 (1979).

▆▆▆ In this case the court applied a "more probable than not" standard as measured by mathematical probability. In the case of multiple suspects, this standard would transform the rule of "reasonableness" into a rule of mutual exclusivity in the determination of probable cause to search. Under this more restrictive standard a court would be unable to issue search warrants for the homes or offices of multiple suspects whenever there is a greater likelihood of locating the evidence in one location as opposed to the others, notwithstanding the existence of reasonable cause short of mathematical probability to search all locations. Only in the event that the initial search of the more likely location proved less than completely successful could a search warrant issue for the next more likely location, as determined by a comparative analysis among the remaining locations. The consequences which such a standard holds out for law enforcement are not insubstantial. Pending the issuance and execution of warrants for the next more likely location, there is nothing to prevent a timely warning by an occupant of the premises first searched to the occupants of the unsearched locations that a search is imminent, thereby endangering the loss or destruction of evidence at these latter locations. We reject this "more probable than not" standard as a constitutional measure of probable cause. *See* Model Code of Pre-Arraignment Procedure § 120.1, comment 4(b) at 294–96 (1975). In the case of multiple suspects, for each of whom there are reasonable grounds to believe they partici-

pated in a particular criminal offense, probable cause to search means no more than a showing of reasonable grounds to believe incriminating evidence is present on the premises to be searched. This interpretation of probable cause accords with our numerous past decisions which consistently have equated "probable cause" with "reasonable grounds"—and not necessarily mathematical probability—in the resolution of suppression issues. *See e.g., People v. Vigil,* 198 Colo. 185, 597 P.2d 567 (1979); *People v. Saars,* 196 Colo. 294, 584 P.2d 622 (1978); *People v. Weinert,* 174 Colo. 71, 482 P.2d 103 (1971); *Gonzales v. People,* 156 Colo. 252, 398 P.2d 236 (1965).

▆▆▆ The affidavit, when measured by the standard of reasonableness and read in a common sense manner, establishes probable cause to search Iden's residence. It recites facts indicating that the motivation for the extortion scheme was the alleged theft of Iden's money and gems being held for him by Hearty. It also establishes that Iden, with the assistance of Hearty and Amezquita, targeted Kevin Engel as the alleged thief and utilized the alleged extortion scheme and the concomitant surveillance to retrieve some of Iden's stolen money. In addition, the affidavit includes facts establishing the likely existence of photographs, rental car documents, and other records pertaining to the surveillance of the Engels. Since Iden as the alleged victim of the theft was the principal beneficiary of the extortion efforts, there were reasonable grounds to believe that evidence of the surveillance would be located at the Iden residence on May 12, 1981, the date the search warrant issued.

### B.

▆▆▆ The district court also based its suppression ruling upon the purported staleness of the facts recited in the affidavit. We do not agree with the court's conclusion in this respect.

The affidavit alleged not a single incident but a series of transactions which commenced on March 8, 1981, and were still

continuing on April 26, 1981, when Engel contacted Amezquita about the return of his Porsche automobile. Indeed, according to the affidavit, Skinner discussed the Engel matter with Iden as late as May 4, 1981, at Iden's place of business, and from all indications the extortion efforts were still being actively pursued at that time. The interval between the time frame during which these events occurred and the date of the warrant's issuance, May 12, 1981, was not such as to invalidate the affidavit as stale. *See, e.g., People v. Schmidt,* 172 Colo. 285, 473 P.2d 698 (1970); *People v. Ball, supra.* On the contrary, the continuity and timing of the events described in the affidavit support the conclusion that seizable objects were present in Iden's residence when the warrant was issued.

## C.

We next consider the seizure of the cocaine and narcotics paraphernalia from the leather bag recovered in the bedroom of the Iden residence. In suppressing this evidence the court ruled that although the leather bag was in plain view, the officer had no right to search the inside of the bag. We believe the court's ruling reflects a misapplication of the plain view doctrine to the facts of this case.

A plain view seizure is permissible under the following circumstances: there must be a prior valid intrusion; the discovery of the evidence must be inadvertent; and the officer must have reasonable cause to believe that the exposed item is incriminating. *E.g., Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *People v. Franklin,* Colo., 640 P.2d 226 (1982); *People v. Stoppel,* Colo., 637 P.2d 384 (1981); *People v. Torand,* Colo., 622 P.2d 562 (1981); *People v. Harding,* Colo., 620 P.2d 245 (1980).

In the instant case the initial intrusion into the Iden residence was justified by virtue of the search warrant. That warrant authorized the officers to search for an automobile title and any documents pertaining to the recent surveillance conducted on the Engels. In searching for these documentary items the officers legitimately could open bags and pouches to determine whether the materials sought were located inside these closed objects. The suppression testimony in this case establishes without dispute that the cocaine and narcotic paraphernalia were discovered in this very fashion. Given the highly incriminating character of these objects as contraband, there was no constitutional prohibition against their seizure under the plain view doctrine.

## III. *The Search of the Attorney's Office*

We now address the suppression of the files and manila envelope seized from the law offices of Wollrab and Younghans in the course of the search pursuant to warrant on May 15, 1981. The court suppressed these items because, in its view, "the description of the items to be seized, namely the financial and bookkeeping records or ledgers, does not warrant the seizure of client files, which clearly these were, as indicated by the testimony of the [searching] officer." We agree with the district court that the items seized were beyond the scope of the warrant.

## A.

As a preliminary matter the district attorney asserts that the defendants lack standing to contest the search of the attorney's office or, in the alternative, they are barred from contesting the search under principles of *res judicata* and collateral estoppel. We find no merit to these claims.

The district attorney concedes that these arguments were not raised in the district court. In fact, the district attorney acquiesced in the entry of appearances of counsel for Iden, Hearty and Amezquita at the hearing on Younghans' motion to quash the grand jury subpoena and to return evidence seized from her office. Furthermore, although the district attorney at the suppression hearing before Judge Neighbors initially objected to the defendants' standing to contest the search of Younghans' office, he later withdrew any objection on that basis. Under these circumstances, any

objection to the defendants' standing to challenge the search of Younghans' office has been waived. *See Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (government loses its right to raise a defendant's lack of standing to challenge a search when it acquiesces in contrary findings or fails to raise the issue in a timely fashion during litigation).

We see no basis in this case for the application of either *res judicata* or collateral estoppel. *Res judicata* is a claim preclusion and renders an existing judgment conclusive as to the rights of the parties or their privies in any subsequent proceeding based on the same cause of action. *See, e.g., Metropolitan Gas Repair Service, Inc. v. Kulik,* Colo., 621 P.2d 313 (1980); *Pomeroy v. Waitkus,* 183 Colo., 344, 517 P.2d 396 (1973). Collateral estoppel, which is a form of issue preclusion attaching to a subsequent adjudicatory proceeding, requires an identity of issue, an identity or privity between those parties against whom the doctrine is asserted, and a full and fair opportunity to litigate the issue in the prior proceeding. *Metropolitan Gas Repair Service, Inc. v. Kulik, supra; Pomeroy v. Waitkus, supra; Mangus v. Western Casualty and Surety Co.,* 41 Colo.App. 217, 585 P.2d 304 (1978). Both doctrines require the prior entry of a final judgment. The denial of a motion to quash a subpoena is interlocutory in character and is not a final judgment. *See, e.g., Dibella v. United States,* 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); *D. H. v. People,* 192 Colo. 542, 561 P.2d 5 (1977); *Gonzales v. District Court,* 164 Colo. 433, 435 P.2d 384 (1967).

Moreover, *res judicata* requires an identity of parties and collateral estoppel requires an identity of issues. Here, there is neither an identity of parties nor of issues. The hearing conducted by Judge Scott was directed to Younghans' motion to quash on the basis that the disclosure of the subpoenaed evidence would violate the attorney-client privilege and the work product doctrine. The later hearing by Judge Neighbors on the defendants' motion to suppress did not involve any claim of law-

yer Younghans and raised issues separate and apart from the attorney-client privilege. Thus, neither *res judicata* nor collateral estoppel has any application here.

### B.

The Fourth Amendment to the United States Constitution requires that a search warrant particularly describe the objects to be seized. Article II, Section 7 of the Colorado Constitution provides that no search warrant shall issue without describing the things to be seized "as near as may be." The particularity requirement serves multiple purposes. It prevents a general search, the dreaded practice authorized by the colonial "writ of assistance." *Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 75, 72 L.Ed. 231, 236 (1927). It also curtails the issuance of search warrants on loose and vaguely stated bases in fact. *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). In addition, it prevents "the seizure of one thing under a warrant describing another." *Marron v. United States, supra,* 275 U.S. at 196, 48 S.Ct. at 76, 72 L.Ed. at 237. This court pointed out the importance of the particularity requirement to this last stated purpose in *People v. Schmidt,* 172 Colo. 285, 473 P.2d 698 (1970). We there noted that "particularity" should be given an interpretation "commensurate with the type of property sought to be seized so that the officer charged with the duty of executing the warrant will be advised with a reasonable degree of certainty of the property to be seized." 172 Colo. at 290, 473 P.2d at 700.

Although the degree of specificity required in a search warrant often will vary with the level of information available to the police and the type of items to be seized, we must be cognizant that a warrant authorizing a search for a person's papers poses significant risks to privacy. In such searches some documentary examination is usually necessary to determine whether a particular document is among the papers authorized to be seized. Consequently, it is incumbent that "responsible officials, including judicial officials ... take care to

assure that [such searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Maryland*, 427 U.S. 463, 482, n. 11, 96 S.Ct. 2737, 2749, n. 11, 49 L.Ed.2d 627, 643, n. 11 (1976). We believe that rigid adherence to the particularity requirement is appropriate where a lawyer's office is searched for designated documents. Anything less than a strict limitation of the search and seizure to those documents particularly described in the warrant could result in a wholesale incursion into privileged communications of a highly sensitive nature. Once the privileged communication is revealed to the police, the privilege for all practical purposes has been lost.

 In this case the issuing judge narrowly framed the warrant so as to authorize the search for and seizure of a rubber stamp and bookkeeping and financial records pertaining to Iden, Hearty, Amezquita, and the Colorado Gem Exchange. Although not expressly stated in the warrant, the warrant's authorization to search for "financial and/or bookkeeping records and/or ledgers" pertaining to Iden, Hearty, Amezquita and the Colorado Gem Exchange contemplated some limited examination of files within the lawyer's office in order to locate the particular records described in the warrant. Clearly, however, the warrant did not authorize the seizure of the entire client file pertaining to these suspects solely on the basis of the name appearing on the outside of the file and with no indication that the sought material was located within the file. That such a blanket seizure was not authorized by the warrant is obvious from the face of the

warrant itself which stated: "The execution of this Warrant is not to violate any attorney-client privilege as such may exist regarding any property not described above." Detective Hayes virtually conceded at the suppression hearing that he knew the files seized from Younghans' office were client files and that they were seized on that basis alone.[11] Detective Hayes also admitted that he made no examination whatever to determine whether the files might have contained the financial or bookkeeping records described in the warrant.[12] In the case of the manila envelope there likewise was no indication that it contained the financial or bookkeeping records sought in the search.[13] In fact, the cursory examination of the contents of the envelope disclosed to Detective Hayes that it likely contained information relating to Craig Skinner and as such clearly was outside the scope of the warrant. Furthermore, the seizure of the manila envelope and its contents cannot be justified under the plain view doctrine. That doctrine requires, *inter alia*, a showing that Detective Hayes, at the time of the seizure, had present knowledge of facts establishing a reasonable nexus between the documents seized and criminal behavior. *See People v. Franklin*, Colo., 640 P.2d 226 (1982). The prosecution's evidence at the suppression hearing failed to establish this requisite showing. Detective Hayes testified that upon opening the manila folder he merely observed smaller envelopes with colored dots on them, a piece of paper with the name of Craig Skinner on it, and a report which, although ostensibly relating to some burglary investigation, was not further identified or connected in any

---

**11.** Detective Hayes testified that the officers did not enter the file cabinet marked "Clients' Files" because they already had found and seized the files marked "Hearty" and "Iden."

**12.** Detective Hayes testified as follows:

"Q: Was there anything on the three files that you did seize that referred to . . . financial records or bookkeeping records and ledgers and that type of thing in those files? A: I wouldn't—just the glance that I got at the things, I believe there was just a name, nothing indicating specifically what was in the file."

**13.** Detective Hayes' testimony in regard to the manila envelope was as follows:

"Q: Okay. Now, with regards to the manila envelope that you seized from Ms. Younghans' desk in the locked drawer, were there any markings or anything on that to indicate that contained any financial documents, ledgers and the other items specified in the search warrant?
A: There's nothing on the outside of the envelope."

manner with either the extortion case under investigation or any other known criminal behavior.

Considering the suppression testimony of Detective Hayes as well as the terms of the warrant itself, which described the property to be seized as "financial and/or bookkeeping records and/or ledgers" pertaining to the defendants and expressly warned the officers against violating the attorney-client privilege in the execution of the warrant, we cannot say that the district court erred in suppressing the client files and manila envelope as outside the scope of the warrant. On the contrary, under the particular circumstances of this case, we are satisfied that the seizure of this evidence constituted an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution.

We affirm that part of the ruling suppressing the clients' files and manila envelope seized from Younghans' law office and we reverse that part of the ruling suppressing the objects seized from the Iden residence.