**The PEOPLE of the State of Colorado,
Plaintiff-Appellant,**

v.

**Donald W. HOGAN, Defendant-Appellee.**

Nos. 82SA20, 82SA24, 82SA25,
82SA26 and 82SA27.

Supreme Court of Colorado,
En Banc.

Aug. 16, 1982.

R. Dale Tooley, Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., David Purdy, Chief Deputy Dist. Atty., Denver, for plaintiff-appellant.

J. Gregory Walta, Colorado State Public Defender, Deborah S. Waldbaum, Deputy State Public Defender, Denver, for defendant-appellee.

QUINN, Justice.

This is an interlocutory appeal by the People from the district court's order suppressing evidence seized from the residence of the defendant, Donald W. Hogan.[1] Al-

though we affirm the suppression ruling, we do so for reasons different from those relied upon by the district court.

## I.

At approximately 11:35 p. m. on April 8, 1981, Officer Daniel Yount and three other officers of the Denver Police Department went to the defendant's residence at 3806 W. Virginia Street in Denver in order to serve him with a summons and to take him to the police station in connection with a municipal ordinance violation involving disturbance by telephone. During his suppression testimony Officer Yount described this type of pickup as a routine police procedure. In response to questions from the court the officer testified as follows:

"Q Now, could you tell me why, when you went over to arrest Mr. Hogan, you didn't get a warrant from the county court first to arrest him?

"A Yes, ma'am. It was on a city ordinance violation, and the pickup had been placed. The procedure in that case was to take Mr. Hogan down, serve him with a copy and return him to his home.

"Q Your plan was to go to his home, advise him of the city ordinance violation?

"A That's exactly what we did at the time, ma'am.

"Q To arrest him?

"A To detain him long enough to serve him.

"Q To serve him with a Summons?

"A Yes.

"Q Did you have to take him back to the police station to do that?

"A We have to take him to headquarters. They have to be served with a copy and then returned. That's a departmental procedure.

The court denied the defendant's motion to suppress a statement and a photographic identification. These rulings are not at issue in this appeal and we express no view on them.

---

1. The suppressed evidence related to five cases filed against the defendant. Although the hearing on the motion to suppress was held on one of the pending cases, the court subsequently applied its ruling to the four other cases as well. All five cases have been consolidated for the purpose of this interlocutory appeal.

"Q Then he is returned to his home?

"A Yes ma'am."

According to Officer Yount, the defendant had a prior criminal record and information had been received that he might have a weapon in his home. For these reasons four officers were dispatched to his residence.

When the officers arrived at the defendant's residence they knocked on the front door. The defendant opened the door and, when asked his name, identified himself as "Rodney Barringer." Earlier in the evening one of the officers had viewed a photograph of Donald Hogan in a police bulletin and, based on this viewing, he believed the defendant was the person they were seeking.[2] The officers requested to enter the home but the defendant refused permission. Upon being asked for identification, the defendant stated that he would get his wallet. When he turned around to do so, the officers entered the living room, purportedly for their own protection. The room being dimly lit, the officers shined their flashlights and observed an ashtray containing the remnants of marijuana cigarettes, seeds and residue, and a rifle mounted on a wall.

After the officers accomplished their entry, the defendant handed Officer Yount a driver's license containing a photograph dissimilar to the defendant and bearing the name of Rodney Barringer. At this point the officers arrested the defendant for disturbance by telephone[3] and for a separate ordinance violation, giving false information to a police officer.[4] Officer Yount then examined the rifle on the wall and unloaded two live rounds from the chamber. The officers secured the house and told the defendant's companion to leave. The defendant was taken to the police station.

At the police station Officer Yount telephoned Rodney Barringer who explained that his wallet containing his driver's license, credit cards and some cash had recently been stolen from his locker at an athletic club. Officer Yount prepared an affidavit recounting his observations made during the defendant's arrest as well as the information conveyed to him by Rodney Barringer.[5] A search warrant was issued

2. The reason the defendant's photograph appeared in the police bulletin was not explained during the suppression hearing.

3. Denver Rev.Mun.Code § 842.1.

4. Denver Rev.Mun.Code § 846.5–4.

5. The affidavit, upon which the search warrant issued, stated:

"Your affiant is a police officer for the City and County of Denver. On 4–8–81 at approximately 11:35 p. m. your affiant, along with officers David Archuleta 80–46; Bernard Montoya 78–08 and Cynthia Brewer 78–23 responded to 3806 W. Virginia [A]ve. for the purpose of serving Donald Bruce Hogan (9–30–48) for the offense of Disturbance by Telephone. Mr. Hogan answered the door and when asked his name by your affiant he replied that it was Rodney Barringer. Officer Archuleta related to your affiant that he had observed a picture of Donald Hogan and that the party who stated he was Barringer looked like the photograph. Donald Hogan was then asked for some identification to show who he was and stepped away from the door to get the identification. Your affiant and the other officers stepped inside the door, and Donald Hogan removed from a wallet which was under a TV stand, and gave to your affiant ID for a Rodney R. Barringer. After looking at the ID your affiant determined that Donald Hogan and Rodney Barringer were not the same parties, and arrested Hogan for false information to a police officer and [d]isturbance by telephone. The arrest was made by your affiant in the living room, which is just inside the front door. Your affiant also observed in the same room, next to the door[,] a Marlin 30/30 lever action rifle which was found to be loaded with two rounds. The rifle was checked as it was within the reach of the arrested party who was still dressing in the livingroom. Your affiant also observed in plain view, in an ashtray located in the livingroom on a table in the southwest corner[,] several "roaches" or remnants of marijuana cigarettes, marijuana seeds, and some cut marijuana leaves and stems. Your affiant left officers Montoya and Brewer to secure the house and took Mr. Hogan to City Jail. At Denver Police Headquarters, your affiant, on 4–9–81 at approximately 12:30 a. m. contacted by phone Rodney R. Barringer of 7679 Johnson [S]t. Arvada, Co. Mr. Barringer related to your affiant that on 3–20–81 between the hours of 6:00 p. m. and 9:00 p. m. unknown person(s) entered his locker at the Colorado Athletic Club located at 4890 Carr [S]t. Wheatridge, Co. and removed his wallet containing several credit cards, drivers license, and papers along with $20.00 cash. Mr. Barringer also related that he reported the theft to the credit card companies involved, but

authorizing the search of the defendant's home for dangerous drugs and drug paraphernalia, a Marlin 30/30 rifle, the articles belonging to Rodney Barringer and any documents establishing the identity of the owner or occupant of the residence.

The warrant was executed by approximately six to eight officers in the early morning of April 9, 1981. During the search of the premises the officers observed numerous items which they believed had been stolen. In all, the police seized approximately 76 items, ranging from illegal drugs to stereo and camera equipment, as well as credit cards and pieces of identification belonging to various people. By conducting computer checks of the serial numbers on many of the items and by contacting the owners of various articles previously reported stolen, the officers were able to verify the stolen character of much of the property seized.

As a result of the seizure the defendant was charged by information in five cases with aggravated robbery[6] and the commission of a crime of violence.[7] After hearing testimony on the defendant's motion to suppress evidence, the court found that the officers went to the defendant's home to effect a warrantless arrest, that neither consent nor exigent circumstances justified the entry into the home for that purpose, and that the officers' observations inside the home were tainted by the illegal entry. The court then suppressed those items not specifically described in the warrant on the ground that these articles were outside the scope of the warrant and, therefore, could not lawfully be seized under the warrant.

We agree with the court's ruling that the officers' entry into the defendant's home was made to effect an arrest inside and, therefore, was in violation of the warrant requirement of the Fourth Amendment. Consequently, the officers' observations in the course of their entry do not meet the requirements of the plain view doctrine. However, we disagree with the reason offered by the district court for the suppression of the various articles seized during the subsequent search of the defendant's home. These articles should not have been suppressed on the ground that they were outside the scope of the warrant but, rather, for the reason that they were the fruit of the illegal observations made at the defendant's home during the illegal entry. Because the record removes all doubt about the character of the evidence suppressed as the fruit of the initial illegality, we affirm the ruling of the district court.

## II.

The People argue that the police were legitimately in the defendant's residence when they observed in plain view the illegal narcotics, the Marlin rifle on the wall, and the driver's license of Rodney Barringer. We disagree.

*Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), controls our resolution of this aspect of the case. Under facts not significantly dissimilar to those present here, the Supreme Court held that the warrantless entry into a home in order to make an arrest, in the absence of consent or exigent circumstances, violates the Fourth Amendment to the United States Constitution. The constitutional significance of the intrusion does not turn so much on whether the purpose is to search or to arrest, but on the intrusive character of a warrantless entry into the home:

"[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth

---

not to the police. Your affiant advised Mr. Barringer to make a report of the theft as soon as possible. Your affiant also had occassion [sic] to examine Denver [P]olice Department records which showed that Donald Hogan had two previous felony convictions since 3–10–71."

**6.** Section 18–4–302(1), C.R.S.1973 (1978 Repl. Vol. 8).

**7.** Section 16–11–309, C.R.S.1973 (1978 Repl. Vol. 8).

Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their ... houses ... shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 589–90, 100 S.Ct. at 1381–82, 63 L.Ed.2d at 652–53.[8]

We recently relied upon *Payton* in *McCall v. People*, 623 P.2d 397 (Colo.1981), where we suppressed a defendant's confession as the fruit of the defendant's illegal arrest inside his home. We pointed out that even prior to *Payton* Colorado case law has prohibited police officers from entering a private residence to effect an arrest in the absence of some well-defined exception to the warrant requirement, such as consent or exigent circumstances. *See, e.g., People v. Moreno*, 176 Colo. 488, 491 P.2d 575 (1971). There is

no reason here to depart from the steady course previously followed in this area of the law.

■ The district court found that the police officers went to the defendant's home for the purpose of arresting him without a warrant, and the evidence demonstrates their entry into the home was in furtherance of this purpose. The suppression testimony of Officer Yount establishes quite clearly that the officers did not merely intend to serve the defendant with a summons at his doorstep. Rather, they intended to take him to the stationhouse where he would be served and routinely processed before his release. Although the defendant refused permission to enter the home, the officers nonetheless crossed the threshold in order to position themselves where they could control his actions. In our view this entry serves only to confirm the officers' intent to take the defendant into custody at that time. The Fourth Amendment is designed to protect against this very type of non-consensual and non-exigent entry into the home for the purpose of arresting the occupant inside. *Payton v. New York, supra; McCall v. People, supra.* To call this procedure anything but a warrantless entry for the purpose of effecting an arrest flies in the face of the facts and, in effect, would reduce the warrant requirement to a nullity.

The remaining consideration is whether the warrantless entry into the defendant's home can be justified by one of the limited

---

**8.** *Payton* involved a challenge to a New York statute authorizing police officers to enter a private residence without a warrant to make a routine felony arrest. Two separate cases were before the Court. In one case the police, after two days of investigation, had assembled sufficient evidence on January 14, 1970, to establish probable cause that Theodore Payton had murdered the manager of a gas station two days earlier. Six police officers went to Payton's apartment on January 15, 1970, to arrest him. After knocking on the door without success they forcibly entered the apartment and found no one present inside. In plain view a 30 caliber shell casing was seized and later admitted at Payton's murder trial. Payton was convicted. The other case involved Obie Riddick who was arrested on March 14, 1974, for two

armed robberies in 1971. Riddick had been identified by the two victims in June 1973 and the police learned of his address during January 1974. About noon on March 14 a detective and three other officers knocked on the door of the Riddick's home. When his young son opened the door, the officers could see Riddick sitting in bed covered by a sheet. They entered the house and placed him under arrest. Before permitting him to dress, they opened a chest of drawers close to the bed in search of weapons and found narcotics and drug paraphernalia. Riddick was subsequently indicted on the narcotics charge and was convicted. Because no arrest warrants were obtained in either of the cases, the convictions were reversed and the cases remanded for further proceedings.

exceptions to the warrant requirement. The People do not dispute that the defendant refused consent for the entry. The critical consideration is whether the officers' apprehension of danger justified their warrantless entry into the home to secure their own safety.

■■ The exigent circumstances doctrine runs counter to Fourth Amendment guarantees and, for this reason, the scope of the exception must be strictly circumscribed by the exigencies which justify its initiation. *Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978). In *McCall v. People, supra,* we stated that exigent circumstances generally have been limited to those bona fide situations which legitimately require swift police action, such as the hot pursuit of a fleeing suspect, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); the risk of the immediate destruction of evidence, *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); or a colorable claim of an emergency threatening the life or safety of another, *People v. Amato,* 193 Colo. 57, 562 P.2d 422 (1977). The burden of proof is upon the prosecution to establish the existence of facts which render the warrantless entry truly imperative. *E.g., Mincey v. Arizona, supra; Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *McCall v. People, supra.*

It was the district court's prerogative to determine from the evidence whether the prosecution proved the existence of exigent circumstances justifying the warrantless entry into the defendant's home. Here the trial court found under the totality of circumstances that the police were not confronted with an emergency. The evidence is uncontroverted that the police knew where the defendant lived and had adequate information and time to obtain a warrant for his arrest. There was no evidence of flight, nor of destruction of evidence. As to whether the entry was necessary to secure the officers' safety, the court expressly found that "all [the defendant] did . . . when asked for identification, [was to] say that he had to go back to get his wallet, which is not inherently suspicious or unreasonable behavior in any way." Given the state of the record before us, we cannot say that the trial court's conclusion on the issue of exigent circumstances is unwarranted.

Moreover, we cannot close our eyes to the implications which a contrary ruling might have on Fourth Amendment doctrine. Given the court's finding that the officers went to the defendant's home to effect a warrantless arrest inside the home, any arguable emergency necessarily would have its source in the officers' presence at the home in disregard of the warrant requirement. If a purported exigency arising directly from a violation of the warrant requirement can serve as the legal basis for the officers' warrantless entry into the home, then the warrant requirement serves no meaningful function and the enhanced privacy interest attaching to one's residence is illusory. We therefore find no error in the district court's ruling that the warrantless entry into the defendant's home violated the Fourth Amendment to the United States Constitution.

### III.

■■ The exclusionary rule not only bars the admission of evidence illegally acquired but also prohibits the government from utilizing evidence which is the direct fruit or product of the initial illegality. *E.g., Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *McCall v. People, supra; People v. Lowe,* 616 P.2d 118 (Colo.1980). Because the entry into the home was illegal, the officers' observations resulting from that entry are beyond the pale of the plain view doctrine. A "plain view" observation requires a prior valid intrusion at the outset, a factor lacking in this case. *E.g., Washington v. Chrisman,* —— U.S. ——, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *People v. Hearty,* 644 P.2d 302 (Colo.1982); *People v. Frank-*

lin, 640 P.2d 226 (Colo.1982); *People v. Stoppel*, 637 P.2d 384 (Colo.1981); *People v. Torand*, 622 P.2d 562 (Colo.1981).

■ The appropriate question in this situation is whether, granting the establishment of the primary illegality, the evidence has been acquired by the exploitation of that illegality or, instead, by means sufficiently distinguishable to be purged of the primary taint. *Wong Sun v. United States, supra.* Here it is undisputed that the sighting of the illegal drugs in the defendant's living room, the discovery of the rifle on the living room wall, and the viewing of Rodney Barringer's driver's license occurred in each instance immediately after the officers' non-consensual and unjustified entry into the defendant's home. The record also demonstrates that Officer Yount learned the identity of Rodney Barringer, contacted him, and obtained information about a theft only as the result of his observations inside the home. Given this unbroken chain of events, we view all this evidence as the constitutionally tainted fruits of the initial illegality. When this evidence is excluded from the affidavit supporting the search warrant, probable cause for the issuance of the warrant is totally lacking.

## IV.

Except for those articles specifically described in the search warrant, the court suppressed all items seized during the execution of the warrant on the ground that the seizure exceeded the scope of the warrant. In its ruling the court indicated that the officers should have obtained a second warrant before seizing any articles not particularly described in the first warrant. Although we disagree with the legal basis relied upon by the court, we nevertheless affirm the suppression ruling on an independent ground.

■ Our rejection of the court's basis for suppression is apparent from our recent decision in *People v. Franklin, supra,* which was decided subsequent to the court's ruling in this case. In *Franklin*, we held that where, in the course of an otherwise valid search pursuant to warrant, police officers come upon an article for which they have present knowledge of facts establishing a reasonable nexus between the article and criminal behavior, the article may be seized under the plain view doctrine, even though the article does not relate to the criminal activity being investigated under the warrant. Under such circumstances no additional warrant need be sought because the plain view doctrine itself provides the legal justification for the warrantless seizure. *E.g., People v. Hearty, supra; People v. Franklin, supra; People v. Stoppel, supra.* Of course, the propriety of the seizure depends upon the satisfaction of all the conditions of the plain view doctrine, particularly, as pertinent here, a prior valid intrusion, as well as an inadvertent discovery and reasonable cause to believe the article is incriminating. *Id.*

In this case the initial intrusion was illegal and the observations made immediately thereafter in the defendant's house were constitutionally tainted. Similarly tainted was the information obtained from Rodney Barringer. Because the record demonstrates beyond any doubt that this constitutionally tainted evidence provided the basis for the issuance of the search warrant, without which probable cause could not be established, the search warrant itself was invalid and all evidence seized in the course of the execution of the warrant must be suppressed. For these reasons we affirm the ruling of the district court.

ROVIRA, Justice, dissenting:

I respectfully dissent. I believe that exigent circumstances justified the officers' entry into the defendant's home. Furthermore, since the officers were legitimately on the premises when they made their observations, the suppressed evidence should have been admitted under the plain view doctrine.

The record reveals that the officers went to the defendant's home for the purpose of having him accompany them to the police station to receive service of a summons in connection with the violation of a municipal

ordinance. While it is true that the police did not have an arrest warrant and could not have compelled the defendant's cooperation, I see no reason, under Fourth Amendment principles, why the police could not seek to obtain the defendant's consent to go to the police station and receive service of the summons. *See United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Thus, the police did not act improperly in going to the defendant's home.

Once at the defendant's door, the actions of the defendant, along with facts within the knowledge of the officers, provided sufficient exigencies to allow the officers to cross the threshold into defendant's home without a warrant. *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *People v. Bustam*, 641 P.2d 968 (Colo.1982); *People v. Williams*, 613 P.2d 879 (Colo.1980).

Prior to going to the defendant's residence, the police officers knew that the defendant had a criminal record involving violent offenses, and they had information that the defendant might have a weapon in his home. Further, one of the officers had seen a photograph of the defendant in a police bulletin and knew what he looked like.

Upon confronting the defendant, the officers asked him his name. He falsely identified himself as Rodney Barringer. At that time, he was asked to produce identification and, in response, he stated that he would get his wallet and turned back into his dimly lit residence.

I conclude that under these circumstances it was permissible for the officers to step inside the house in order to protect themselves and to maintain control of a potentially dangerous situation. The premises were dimly lit, the defendant had falsely identified himself, the officers knew of defendant's prior record for violence and had information that he may have had a weapon inside his home. Constant observation of the defendant was essential to ensure the officers' safety and self-protection. Further, the entry was a limited response tailored to the exigencies presented. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

Once inside the house, the officers' observations were permissible under the plain view doctrine. Plain view requires a prior valid entry, the inadvertent discovery of evidence, and probable cause to believe the articles observed are connected to criminal behavior. *People v. Hearty*, 644 P.2d 302 (Colo.1982); *People v. Franklin*, 640 P.2d 226 (Colo.1982).

Here the entry was a permissible limited response to the situation presented. Thus, the valid entry requirement was fulfilled.

The observation of the illegal drugs in the ashtray in the room was inadvertent. The fact that the officers used their flashlights does not change the result since the room was dark, and the officers were attempting to survey the surroundings in order to ensure their safety. *See People v. Waits*, 196 Colo. 35, 580 P.2d 391 (1978); *People v. Haggart*, 188 Colo. 164, 533 P.2d 488 (1975).

Finally, the requirement that the items observed be connected with criminal activity is clearly met when the item is illegal drugs. *See Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *see also People v. Franklin, supra.*

Since the requirements of the plain view doctrine have been met, the officers' observations plus the information conveyed to the police by Rodney Barringer could serve as the basis for the affidavit filed in support of the search warrant for the objects described therein: the dangerous drugs and drug paraphernalia, the rifle, the articles stolen from Rodney Barringer, and documents establishing the identity of the person in control of the premises.

In my view, the majority has unduly constricted the exigent circumstances exception so clearly set out in *Payton v. New York, supra.* Seen from afar, the perception of danger which a police officer acts upon becomes dimmer, and it is all too easy

to conclude that the danger was not of such magnitude that a warrantless entry was justified.

Moreover, even if one accepts the majority's conclusion that exigent circumstances did not exist, the evidence should not be suppressed. The result of the majority opinion is that evidence relating to five aggravated robbery cases and a crime of violence involving this same defendant has been suppressed and will not be available at trial. This loss of probative evidence is too great a social price to pay, under the facts of this case, for what is at most, in hindsight, a good faith mistake in judgment by the police as to whether exigent circumstances existed which warranted their stepping across the threshold of the defendant's home to protect themselves.

Here the police officers had to make a quick decision. They acted as reasonably prudent officers in the good faith belief that their conduct was lawful, and they had a reasonable basis for this belief.

The facts of this case present the court an opportunity to consider the rationale for the exclusionary rule. It is "a judge-made rule crafted to enforce constitutional requirements, justified in the illegal search context only by its deterrence of future police misconduct." *United States v. Williams*, 622 F.2d 830, 841–42 (5th Cir. 1980).

The majority opinion applies a rule of exclusion which will have little or no effect on police conduct. For when, as here, police believe themselves in a dangerous or precarious position, they will act to prevent harm to themselves. If at a later time their judgment is called into question and evidence excluded, I do not believe this will deter a similar response in the future. A good faith mistake about the dangerousness and exigencies which existed at a moment of time should not require exclusion of the evidence found in the search.

I am persuaded that the views expressed by a majority of the court in *United States v. Williams, supra,* concerning the exclusionary rule and the reasonable good faith exception thereto are sound and should be applied in this case. There the court said:

"Where the reason for a rule ceases, the rule should also cease—a familiar maxim carrying special force here. For here the cost of applying the rule is one paid in coin minted from the very core of our factfinding process, the cost of holding trials at which the truth is deliberately and knowingly suppressed and witnesses, in contravention of their oaths, are forbidden to tell the whole truth and censured if they do. This is a high price indeed and one that ought never be paid where, in reason, no deterrence is called for and none can in fact be had. Such a continued wooden application of the rule beyond its proper ambit to situations that its purposes cannot serve bids fair to destroy the rule entirely in the long run."

622 F.2d at 847.

I would reverse the ruling of the trial court.

HODGES, C. J., joins in this dissent.