**CENTRAL WYOMING LAW ASSOCIATES, P.C., formerly Hursh and Donohue, P.C., d/b/a Hursh, Donohue & Massey, P.C., a Wyoming professional corporation, Plaintiff,**

v.

**The Honorable Robert B. DENHARDT, in his capacity as County Court Judge of Fremont County, Wyoming, and William Flagg, in his capacity as County Attorney of Fremont County, Wyoming, and those acting under his direct supervision, Defendants.**

No. 93–CV–1011–B.

United States District Court, D. Wyoming.

Oct. 28, 1993.

Michael J. Krampner, Casper, WY, John R. Hursh, Riverton, WY for plaintiff.

Hugh L. Kenny, Sr. Asst. Atty. Gen., Elizabeth Zerga, Cheyenne, WY, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon defendants' Motions for Summary Judgment and the plaintiff's Motion for Declaratory Relief, and the Court having reviewed the materials on file herein both in support of and in opposition to, having heard oral argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

### Background

Central Wyoming Law Associates ("CWLA") filed this suit against The Honorable Robert Denhardt, a Fremont County Judge, for allegedly issuing a search warrant in violation of the Fourth Amendment, and against William Flagg, the Fremont County attorney, and the county attorney's office for seeking and executing this warrant. The search warrant authorized the search of confidential client files belonging to CWLA, as well as the seizure of a particular document alleged to be in one of those files.

The essential facts are undisputed. On or about November 16, 1991, a minor referred to as "L.H." was arrested and placed in jail in Fremont County pending juvenile proceedings. While L.H. was incarcerated, he alleged that he was physically and sexually assaulted by other prisoners in the jail.[1] Soon after this incident, Mr. Daniel Massey, an attorney employed by CWLA, entered into an attorney-client relationship with L.H. for purposes of representing him during the

1. In its opposition to summary judgment, CWLA contends that this incident arose under circumstances that "strongly suggested" that the Fre-
mont County sheriff and his deputies failed to exercise due care for L.H.'s safety.

juvenile proceedings. Shortly thereafter, L.H. told Massey that he had been assaulted while in jail, and L.H. and his parents then asked Massey to investigate these claims for purposes of determining whether L.H. might have a valid claim for damages against the Fremont County sheriff's office.

Several months later, in the early part of 1992, Massey spoke to another minor known as "R.F.," who shared a cell in the Fremont County jail with L.H. in November of 1991. R.F. told Massey that he had firsthand knowledge of the assault on L.H. At that time, R.F. gave Massey a statement that Massey memorialized and had R.F. sign.[2]

Sometime later in 1992, Fremont County deputy sheriff John "Jack" Coppock, acting with the advice and assistance of deputy county attorney Ed Newell, began a separate investigation on behalf of Fremont County into L.H.'s allegations of physical and sexual assault. Coppock attempted to locate R.F. based on information that he was given from R.F.'s mother, but that information was inaccurate, and he was never able to locate R.F. to ask him about this incident.[3] Coppock then phoned L.H. to speak to him directly about what had happened, but L.H. and his parents refused to speak to Coppock. They told him that their attorney, Dan Massey, advised them not to speak to anyone, including the authorities, about L.H.'s assault.

Coppock, with the assistance of deputy county attorney Newell, decided that he would prepare an affidavit in support of a search warrant in an effort to obtain a copy of the statement that R.F. gave to Massey.[4] The affidavit was subsequently prepared and presented to Judge Denhardt on December 31, 1992. Denhardt then placed Coppock under oath and Coppock swore under oath that the representations in his affidavit were truthful. Denhardt apparently concluded that the affidavit provided sufficient facts to support a finding of probable cause, and therefore, issued the search warrant.[5]

The warrant described the premises to be searched as "[t]he law offices of Hursh, Donohue & Massey, P.C., being a brown 1 story building at 105 South 6th East, Riverton." The property that was the subject of the warrant was described as "[w]ritten and/or typed statements by [R.F.] concerning an alleged assault against [L.H.] which occurred in the Fremont County Jail." After issuing the warrant, Denhardt "suggested" to county attorney Newell that he accompany Coppock to the premises in order to oversee the execution of the warrant.

Coppock, accompanied by several other deputies, executed the warrant later that day. Upon their arrival at CWLA's law offices, Coppock knocked on the door. He showed Donald Rissler, an attorney of CWLA, the warrant and told him to produce the statement. Rissler, concerned over the legality of a search of an attorney's confidential files, asked the officers to wait a little while so he and several other CWLA attorneys who were present could do some legal research on the validity of this warrant. After an hour or so, Rissler attempted to reach a judge in Fremont County in an effort to prevent the warrant from being executed. His efforts were unsuccessful, however, primarily because it was New Year's Eve and he could not locate a judge.

2. The parties do not contest the conclusion that while this statement would not be covered by the attorney-client privilege since R.F. was not Massey's client, it nonetheless constitutes Massey's "work product." *See generally Hickman v. Taylor*, 329 U.S. 495, 510–14, 67 S.Ct. 385, 393–95, 91 L.Ed. 451 (1947).

3. Apparently, R.F. phoned his mother and told her that he was at a certain address in Casper, Wyoming. His mother gave this address to Coppock. Coppock traveled from Riverton to Casper, but the address that he had been given was non-existent. He enlisted the assistance of the Casper authorities trying to locate R.F., but they were unsuccessful as well. Apparently R.F. then called his mother again and gave her another address, which was also non-existent.

4. When Coppock spoke to R.F.'s mother while he was trying to locate R.F., she told him that R.F. had already been interviewed by Massey and had given him a written statement of what he knew about the assault on L.H.

5. Denhardt mistakenly wrote "December 30, 1992" as the date of the warrant when, in reality, the date should have been December 31, 1992. This error is not relevant to any of the issues presented since the parties agree that the warrant was actually issued on the 31st.

Approximately two hours later, Rissler produced an unsigned, draft copy of a statement that Massey had prepared regarding his conversation with R.F. Coppock accepted this draft copy based on the representations of the CWLA attorneys present that they would produce the final, signed version when it was found.[6] Coppock then gave a receipt for the statement pursuant to Wyo. R.Crim.P. 41(e). At no time did the executing officers ever physically rummage through the files of CWLA. R.F.'s statement was produced by Rissler and handed to Coppock without Coppock or any of the other deputies ever handling CWLA's files.

Since Coppock only obtained a draft copy of R.F.'s statement, and not the final, signed version, CWLA immediately filed an action in state court seeking a temporary restraining order against any further searches of their office for the signed statement. A restraining order was issued by the state district court and the signed statement of R.F. was filed with the state court under seal pending further hearing, which never occurred. While the restraining order is technically still in effect, the subject matter of that order, the December 31, 1992 warrant, has expired because according to its own terms, it was only valid for ten days.

Since the time that the warrant was executed, CWLA alleges that Ed Wall, another deputy county attorney, has threatened Lori Gorseth, another CWLA attorney who works for Massey, by telling her that he would obtain subpoenas and search warrants for other files of hers which contained confidential information. Plaintiffs note specific examples of these threats.

Plaintiffs allege that on January 20, 1993, Detective Dale Adams requested certain confidential information from Gorseth regarding a client of CWLA. When she called Wall, he allegedly threatened to get a search warrant for the documents if she did not comply with Adams' request. Then, a few weeks later, Wall served a subpoena on Gorseth commanding her to testify for the prosecution regarding a then-pending criminal prosecution of a client formerly represented by CWLA. Then, sometime in February or March, 1993, Gorseth obtained a copy of an unsigned affidavit and an unissued search warrant prepared by the county attorney's office for the confidential information that Wall allegedly threatened to obtain from Gorseth through a search warrant. Finally, on April 1, 1993, Wall allegedly threatened to have Gorseth thrown in jail if she did not comply with his requests, and allegedly further threatened to use his powers to obtain search warrants for documents that he wanted.

Defendants dispute the plaintiffs' characterization of these so-called threats, and further contend that no other "threats" have been made since the April 1 incident.

This lawsuit was then initiated five days after this last incident between Wall and Gorseth. Plaintiffs' complaint sought a declaratory judgment that the search warrant was *per se* invalid on two grounds: (1) Coppock's affidavit was insufficient to enable Judge Denhardt to conclude that probable cause existed, and (2) the warrant did not describe the items to be seized with particularity as required by the Fourth Amendment. The complaint also sought a prospective injunction seeking to enjoin Denhardt from issuing, and the County attorney's office from seeking, any search warrant for CWLA's offices involving confidential client files. Plaintiffs also sought an order of return to have the state return any and all documents seized during the December 31, 1992 search, as well as attorney's fees and costs.

Defendants have moved for summary judgment alleging several grounds in support thereof. They initially argue that CWLA has no standing to bring these claims because the claims belong to Hursh, Donahue & Massey, and not CWLA. In essence, they contend that CWLA is not the real party in interest under Fed.R.Civ.P. 17(a). As to the validity of the search warrant, they argue that there was probable cause under the "totality of the circumstances" standard of *Illinois v. Gates,* 462 U.S. 213, 231–32, 103

---

6. The reason that the signed statement could not be produced on the 31st was because it was not in Massey's file. It was later found on a secretary's desk.

S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983), and that the warrant did meet the particularity requirements of the Fourth Amendment, citing, *inter alia, Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). As far as the prospective injunction, they strenuously contend that the plaintiff has failed to make the necessary showing that it has standing to pursue this claim, and therefore, the defendants contend that summary judgment is warranted on that claim as well.

Plaintiff filed a combined opposition to the defendants' motion for summary judgment. It first argues that CWLA is the real party in interest. On the merits of the two claims, it argues that there was no probable cause to issue the warrant and that it fails to meet the particularity requirement. In addition, it contends that it has demonstrated that it has standing to seek a prospective injunction based on the alleged threats of Ed Wall against Lori Gorseth.

### Standard of Review

The role of a trial court hearing a motion for summary judgment is only to determine the existence *vel non* of a dispute as to any *material* fact in the case. *See* FED.R.CIV.P. 56(c). It is the province of the court to decide which facts are material as a matter of law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir.1987).

■ If the trial court finds that a factual dispute exists, then summary judgment should be denied. The Court's responsibility is to identify whether disputes exist, not to resolve them. If material factual disputes exist, then *ipso facto,* summary judgment may not be entered "as a matter of law," as required Rule 56(c). But as the Supreme Court has emphasized, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine*

issue of *material* fact." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis added).

■ Rule 56 has been interpreted to place the initial burden of production on the moving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). That party must make a sufficient "showing" to the trial court that there is an absence of evidence to support the non-moving party's case. *Id.* at 322–24, 106 S.Ct. at 2552–53. The movant meets his burden by producing evidence that is admissible as to content, not form, identifying the portions of the record, including the pleadings and any material obtained during discovery, that demonstrate the absence of any genuine issues of material fact. *Id.* at 323–24, 106 S.Ct. at 2552–53.

If the movant meets her burden of production, then the burden shifts to the non-moving party. That party "may *not* rest upon the mere allegations or denials of his pleadings" to avoid summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis added). The non-moving party is now put to their proof. In order to avoid the entry of summary judgment against it, that party must demonstrate that a factual dispute exists as to "an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552; *Carey,* 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey,* 812 F.2d at 623. In making that determination, the trial court must "examine the factual record and [draw all] reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Dorrance v. McCarthy,* 957 F.2d 761, 762 (10th Cir.1992) (quoting *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230 (10th Cir.1990)).

### Discussion

Before addressing the claims presented by the parties, the Court notes at the outset the serious nature of the claims involved in this lawsuit. The issues raised by this case in-

volve fundamental questions regarding both the power and the role of government in our society. The questions posed relate to the most basic and central liberties guaranteed to all citizens by the Bill of Rights, issues about the relationship between individual and government and the proper scope of each one's authority. With these considerations in mind, the Court will now address these issues.

### A. *Real Party in Interest*

■ At the outset, the defendants argue that CWLA is not the real party in interest under Rule 17(a) and that it does not have standing to raise these issues since the aggrieved party is Hursh, Donohue & Massey, P.C.. Defendants' brief uses the phrase "real party in interest" and "standing" interchangeably. The Court notes that while there is some overlap between these two doctrines, they are not synonymous since each serves a distinct purpose. Standing is, at least in part, a constitutional requirement stemming from the case or controversy limitation of Article III, and is therefore relevant to whether a court has subject matter jurisdiction. In contrast, the real party in interest requirement serves a different purpose, summarized by the Advisory Committee in its Note to the 1966 Amendment to Rule 17(a). The Committee stated that:

> [t]he modern function of [Rule 17(a)] is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as *res judicata.*

In the case at bar, the Court concludes that CWLA is, for purposes of Rule 17(a), the real party in interest in this case. Hursh and Donohue, P.C. was a corporation that was formed in the 1970s. Hursh and Donohue, P.C. was in existence on December 31, 1992. Later, Mr. Massey sought to join that firm, and the parties proposed that the name be changed to Hursh, Donohue & Massey, P.C., a separate corporate entity. Mr. Massey later decided not to go through with this venture, and therefore, Hursh, Donohue &

Massey, P.C. ceased to operate. That led in turn attorneys Hursh and Donohue establishing CWLA, the direct successor of Hursh and Donohue, P.C. Since no assets were ever transferred from Hursh & Donohue, P.C. to the new corporation, Hursh, Donohue & Massey, P.C., the cessation of the latter did not require a re-transfer of assets back to Hursh & Donohue, P.C. CWLA is thus a direct successor to Hursh & Donohue, P.C.

The Court is convinced that Hursh and Donohue, P.C. and CWLA are similar enough entities so that a dismissal under Rule 17(a) would not further the underlying purposes of that section. Mr. Hursh testified that no assets ever changed hands between the firms, the officers and directors remained the same, CWLA continued handling cases from the other firm, and that the only difference between these entities was due to the filing of articles of incorporation. Under these circumstances, form will not be elevated over substance, and CWLA may maintain its action in this case.[7]

### B. *The Fourth Amendment Claims*

#### 1. *The Availability of Declaratory Relief*

■ The Declaratory Judgment Act, 28 U.S.C. § 2201 (1988) creates, and FED. R.CIV.P. 57 establishes the procedures for obtaining declaratory relief. A declaratory judgment "gives a means by which rights and obligations may be adjudicated in cases involving an actual case or controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2751 (1983) (citation omitted). Section 2201 does not purport to, nor could it, expand the jurisdiction of the federal courts; it is only a procedural device and does not affect any underlying substantive rights. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937); *see also* 28 U.S.C. § 2072(b) (1988). This means, *inter alia,* that in order

---

7. Moreover, this Court is not persuaded by the cases cited by the defendant in support of its motion since they do not address Rule 17(a), and

in any event, the language in those cases does not support their position.

to seek a declaratory judgment, a party must demonstrate that an actual case or controversy exists.

The Declaratory Judgment Act has withstood constitutional challenges on the grounds that such relief is *per se* premature—ripeness—or that there is no case or controversy under Article III. *Haworth,* 300 U.S. at 239–44, 57 S.Ct. at 463–65. As the Supreme Court has noted, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). This Court has no trouble concluding that there is a live case or controversy in the present case under the criteria set forth above.

■■■■ It is also necessary to establish that an actual case or controversy presently exists in order to obtain a declaratory judgment. If, for example, a declaratory judgment is sought too late in time such that the case has become moot, then a court has no power to issue the requested relief. *See, e.g., Preiser v. Newkirk,* 422 U.S. 395, 402–03, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272 (1975); *Johansen v. City of Bartlesville, Okl.,* 862 F.2d 1423, 1425–26 (10th Cir.1988). Of course, if the case falls within one of the narrow, recognized exceptions to the mootness doctrine, then the case is not considered moot. *See, e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot."); *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (*per curiam* ) (issues that are "capable of repetition, yet evading review" are not moot) (citing *Southern Pac. Terminal Co. v. Interstate Commerce Comm.,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).

■■■■ While neither party raised the issue of mootness, this Court is obligated to raise it *sua sponte* if the Court entertains any doubts in order to insure that it has subject matter jurisdiction over these proceedings. *See Tafoya v. United States Dep't of Justice,* 748 F.2d 1389, 1390 (10th Cir.1984). In the case at bar, this Court finds that the plaintiffs' request for a declaratory judgment that the search warrant was invalid is moot.

The search warrant in this case was valid, under its own terms, for only ten days. It was issued and executed on December 31, 1992, and thus, it ceased to have effect on January 10, 1993. Now, some eight months later, the plaintiff is asking this Court to issue a declaratory judgment as to the validity of a warrant that is no longer in force. This is a classic example of an issue that has become moot.[8]

Nonetheless, this Court finds that this case falls within that narrow class of cases which are "capable of repetition, yet evading review." The Supreme Court has stated that in order to fall within this exception, a party must demonstrate that: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183 (citations omitted).

Both of these criteria are met here. The ten day period that the warrant was in force is too short to allow the issues of probable cause and particularity to be fully litigated, and, in addition, plaintiff's allegations relating to the threats of Ed Wall make it reasonable to assume that another warrant could be issued authorizing the seizure of the same items in the future. The second aspect of this exception only requires a "reasonable expectation," which is a question of probabilities, and not absolutes. Therefore, the Court

---

8. The Court notes that the plaintiff could very easily have sought a declaratory judgment in early January as part of the same proceeding in which it sought a temporary restraining order enjoining future enforcement of the warrant.

That would have been the optimal time to seek a declaration that the warrant was invalid, since it would have still have been in effect, and the likelihood of the enforcement authorities re-executing it would have been very high.

concludes that the case falls within this exception to the mootness doctrine.[9]

Given that there is a live case or controversy which is not moot, declaratory relief is available. The Court will now move on to consider the plaintiffs' Fourth Amendment claims on their merits.

### 2. *The Merits of the Fourth Amendment Claims*

The Fourth Amendment states that:

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. It is readily apparent that in order for a search to be constitutional, compliance with several different components of the Fourth Amendment must be shown. The components relevant to the case at bar include: (1) whether there was "probable cause" to support the issuance of the search warrant; and (2) whether the warrant "particularly describ[ed] the ... things to be seized." These issues will be addressed *seriatim*.

#### a. *Probable Cause*

While the Constitution requires a showing of probable cause before a warrant may be issued, the determination of whether probable cause exists in the context of particular case is often difficult. The Supreme Court has stated that probable cause is a "practical, nontechnical concept[ ]." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). As the standard itself implies, the determination of whether proba-

ble cause exists is based on probabilities and common sense, and as a result, the term cannot be given a specific definition or reduced to a narrow set of legal rules. *See Illinois v. Gates*, 462 U.S. 213, 231–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1982). In *Gates*, the Supreme Court abandoned its prior approach to determining probable cause where an affiant is relying on information provided by an informant. In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Court fashioned a rigorous two-pronged test into the veracity or reliability of the individual informant, and the basis of the informant's knowledge. In *Gates*, however, the Court watered down the rigid standard erected by the prior cases, holding that the "totality of the circumstances" approach was the proper standard to apply in this context. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. The Court concluded that the inquiries mandated under *Aguilar* and *Spinelli* were still relevant considerations and should continue to guide determinations of probable cause. *Id.* The significance of *Gates* was that those considerations would now be applied in a more fluid, practical manner and not as rigidly as they had been in the past.

Although the *Gates* decision does give magistrates and judicial officers more discretion to issue search warrants, there are limitations. For example, *Gates* itself reaffirmed the principle that affidavits in support of search warrants must provide the magistrate with a sufficient factual basis to enable him to make an independent assessment of probable cause. *Id.* at 239, 103 S.Ct. at 2332. Stated another way, wholly conclusory statements that the affiant "has cause to suspect and does believe" that contraband is located

9. The Court is also persuaded by the case of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), which is analytically similar to the case at bar. In that case, brought as a class action, the Supreme Court held that the Fourth Amendment required that a person subjected to a warrantless arrest, and held for trial on an information, must be given a prompt judicial hearing as to probable cause for his detention. *Id.* at 114, 95 S.Ct. at 863. In a footnote, the Court recognized that the issue had become

moot. The Court stated that "[p]retrial detention is by nature temporary and it is most unlikely that an individual could have his constitutional claim decided" before it became moot. *Id.* at 110 n. 11, 95 S.Ct. at 861 n. 11. Since this issue was reasonably likely to recur at least with respect to a member of the respondent's class, the Court concluded that it fell within the "capable of repetition, yet evading review" exception to the mootness doctrine.

on the premises are insufficient to enable the magistrate to independently assess probable cause. *See id.* (reaffirming *Nathanson v. United States,* 290 U.S. 41, 42, 54 S.Ct. 11, 11, 78 L.Ed. 159 (1933)). Moreover, a statement that "[a]ffiants have received reliable information from a credible person and do believe" that illegal drugs are on the premises has also been held insufficient. *Gates,* 462 U.S. at 239, 103 S.Ct. at 2333 (reaffirming *Aguilar,* 378 U.S. at 115, 84 S.Ct. at 1514). Finally, where a search warrant seeks "mere evidence" of a crime, as opposed to fruits or instrumentalities of crime, or contraband itself, the principles enunciated in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), require that there be a nexus between the item to be seized and criminal behavior.[10] *Id.* at 307, 87 S.Ct. at 1650.

After a close review of the record in this case, the Court concludes, albeit with some hesitation, that the representations made by Deputy Coppock in his affidavit[11] provided a sufficient factual basis which, under the totality of the circumstances, could justify Judge Denhardt's finding of probable cause in this case.

It is arguable whether the affidavit complied with the minimum requirements of the Fourth Amendment. A judicial officer faced with this affidavit could just as easily have concluded that there was an insufficient factual basis to justify a finding of probable cause. The most significant arguable defect in the affidavit is its failure to comply with the dictates of *Warden v. Hayden.* It is undisputed that R.F.'s statement falls within the purview of *Warden's* "mere evidence" rule since the statement is not a fruit, instrumentality or contraband. When a search seeks mere evidence of a crime, all that *Warden* requires is a nexus between the item to be seized—the statement of R.F.—and criminal behavior. All that Coppock's affidavit states is that R.F.'s mother told Coppock that R.F. gave a written statement to Massey and that Massey typed the statement and had R.F. sign it. The affidavit therefore arguably fails to provide that nexus that Justice Brennan deemed critical in *Warden.*[12]

10. In *Warden,* the court retreated from its prior holdings which stated that so-called "mere evidence" could not justify the issuance of a search warrant. Under those cases, an officer seeking a search warrant was required to demonstrate that the search was for fruits, instrumentalities or contraband. *See, e.g., Gouled v. United States,* 255 U.S. 298, 309, 41 S.Ct. 261, 265, 65 L.Ed. 647 (1921); *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The *Warden* Court called this dichotomy "wholly irrational," *id.* 387 U.S. at 302, 87 S.Ct. at 1647, noting that there was "no viable reason to distinguish intrusions to secure 'mere evidence' from intrusions to secure fruits, instrumentalities, or contraband." *Id.* at 310, 87 S.Ct. at 1651. The Court stated that the " 'right of the people' [to be secure under the Fourth Amendment] was certainly unrelated to the 'mere evidence' limitation. Privacy is disturbed no more by a search directed to a purely evidentiary object than it is by a search directed to an instrumentality, fruit, or contraband." *Id.* at 301, 87 S.Ct. at 1647.

11. At his deposition, Deputy Coppock admitted that several representations that he made to Judge Denhardt in his affidavit is support of the search warrant were simply not true. The falsity of these representations became apparent when plaintiff learned that Coppock had tape recorded certain conversations he had regarding his investigation in this case. These recordings contradicted the representations contained in Coppock's affidavit, and thus led Coppock to admit

at his deposition that these representations were false.

The plaintiff argues that this supports a conclusion that no probable cause existed. This Court does not agree. A finding that an affiant lied under oath cannot, either logically or practically, serve to allow this Court to reach the post hoc conclusion that no probable cause existed. The issuing officer is entitled to rely on the representations of an affiant made under oath and the probable cause inquiry must be examined in light of the facts presented to that officer as they had been represented to him. It appears to this Court that the proper means to redress Deputy Coppock's unconscionable behavior would be a prosecution for perjury. *See* Wyo.Stat § 6–5–301 (1988) (defining the elements of perjury); *see also Edwards v. State,* 577 P.2d 1380, 1382 (Wyo. 1978).

12. The absence of this nexus is by no means a trivial matter. At oral argument, this Court asked what difference, if any, it would make if R.F.'s statement was actually a grocery list. In response, defendant's counsel contended that it was readily inferable that R.F.'s statement would not be a grocery list, but an eyewitness account of an alleged assault on L.H..

According to counsel for the plaintiff, however, this assumption was not borne out by reality. This explains precisely why the nexus to criminal behavior must be attested to under oath in the

The issue, however, is not whether it can be shown that Judge Denhardt was wrong is his assumption regarding the contents of the statement. The issue is whether a reasonable judicial officer could, on these facts, conclude that probable cause existed. *See Gates,* 462 U.S. at 232, 103 S.Ct. at 2329 (stating that warrants need only be supported by "probable cause," which demands no more than a proper "assessment of probabilities in a particular factual context"); *see also Illinois v. Rodriguez,* 497 U.S. 177, 184–85, 110 S.Ct. 2793, 2798–99, 111 L.Ed.2d 148 (1990) (noting that in the probable cause context, the Fourth Amendment does not require an issuing officer to "always be correct" in his or her factual determinations). The determination of probable cause is left to the broad discretion of the issuing officer, and this Court cannot say that Judge Denhardt's conclusion was beyond the scope of that discretion.

### b. *The Particularity Requirement*

▇ Even if the defendants can demonstrate that probable cause existed, the plaintiff has also argued, as a separate contention, that the warrant failed to comply with the particularity requirement of the Fourth Amendment.

All search warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The determination of whether a search warrant meets the particularity requirement is a question of law. *See United States v. Harris,* 903 F.2d 770, 774 (10th Cir.1990); *United States v. Leary,* 846 F.2d 592, 600 (10th Cir.1988). The purpose of the constitutional requirement that "things to be seized" be stated with particularity is to avoid "general, exploratory rummaging in a person's belongings," *Coolidge v. Hew Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), and to "make[ ] general searches ... impossible and [to] prevent[ ] the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965) (quoting *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)); *see also Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) ("General warrants, of course, are prohibited by the Fourth Amendment."); *Voss v. Bergsgaard,* 774 F.2d 402, 404 (10th Cir.1985).

The Tenth Circuit has taken a practical approach to the determination of whether a warrant meets the particularity requirement. "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wolfenbarger,* 696 F.2d 750, 752 (10th Cir.1982) (citation omitted); *Harris,* 903 F.2d at 775 (citations omitted). In addition, "there is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized." *In re The Matter of the Search of Kitty's East,* 905 F.2d 1367, 1374 (10th Cir.1990) (citation omitted).

In *Andresen,* the Court was faced with search warrant that authorized a search of an attorney's business and legal files for various evidence relating to the crime of false pretenses which the attorney himself had allegedly committed. The Supreme Court upheld, against a particularity challenge, what arguably was an overbroad search warrant.[13] In so doing, the Court implicitly re-

---

affidavit, and not left to conjecture or guess-work by the issuing officer.

**13.** The warrant authorized the executing officers to seize:

title notes, title abstracts, title rundowns; contracts of sale and/or assignments ...; lien payoff correspondence and lien pay-off memoranda to and from lienholders and notcholders; correspondence and memoranda to and from trustees of deeds of trust; lenders instructions for a construction loan or construction and permanent loan; disbursement sheets and disbursement memoranda; checks, check stubs and ledger sheets indicating disbursement upon settlement; correspondence and memoranda concerning disbursements upon settlement; settlement statements and settlement memoranda; fully or partially prepared deed of trust releases, whether or not executed and whether or not recorded; books, records, documents, papers, memoranda and correspondence, showing or tending to show a fraudulent intent, and/or knowledge as essential elements of the crime of false pretenses, in viola-

jected the notion that an attorney's files were somehow exempt from searches and seizures, at least in a case factually similar to *Andresen*, where the attorney himself is the subject of the investigation. *See, e.g., Klitzman, Klitzman & Gallagher v. Krut*, 591 F.Supp. 258, 267–68 (D.N.J.1984) (indicating that existing case law "constitute[s] persuasive precedent against a *per se* rule prohibiting law office searches" where the attorney is the target of the criminal investigation); *People v. Hearty*, 644 P.2d 302, 312–13 (Colo.1982) (*en banc*).

The warrant in this case authorized the seizure of "[w]ritten and/or typed statements by [R.F.] concerning an alleged assault against [L.H.] which occurred in the Fremont County Jail." This Court is very hesitant to conclude that this warrant satisfies the particularity requirement.

As an initial matter, the Supreme Court has recognized that there "are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers [as opposed to physical objects]." *Andresen*, 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11. The Court declared that it was therefore incumbent on "responsible officials, including judicial officials, [to] take care to assure that [searches and seizures of an attorney's files] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.* As another court has stated, "rigid adherence to the particularity requirement is appropriate where a lawyer's office is searched for designated documents. Anything less … could result in a wholesale incursion into privileged communications of a highly sensitive nature." *Hearty*, 644 P.2d at 313; *see also Krut*, 591 F.Supp. at 267 (noting that searches of an attorney's confidential files has "the potential for undermining the attor-

ney-client privilege and work product doctrine, and thereby chilling communications between lawyer and client"); *O'Connor v. Johnson*, 287 N.W.2d 400, 403 (Minn.1979) ("If the police are permitted to search through an attorney's files for documents listed in an otherwise valid warrant, the protection afforded an attorney's work product by [the work product] doctrine will be destroyed."). The Court in *Krut* noted that while these considerations "impel[ ] caution" on the part of law enforcement, they do not "immunize a law office from search, but rather affect the scrutiny that ought to be paid to the particularity and breadth of the warrant, and the scope and nature of the search and resulting seizures." *Krut*, 591 F.Supp. at 267 (citation omitted). Finally, it is worth noting that at least one court has ruled that a warrant authorizing the search of an attorney's office, when the attorney is not suspected of any wrongdoing and when there is no threat that the documents sought will be destroyed, is *per se* invalid.[14] *See O'Connor*, 287 N.W.2d at 405.

The warrant in this case makes no reference to any dates or approximate dates with respect to the statement sought, including the date that the alleged assault took place, or the date that R.F. gave Massey a statement. In addition, while Judge Denhardt did "suggest" that county attorney Newell accompany the executing officers to plaintiffs' offices, other prophylactic measures could have been taken to expressly delineate the narrow scope of the search. For example, in *Hearty*, the issuing officer specifically wrote on the warrant that the "execution of this Warrant is not to violate any attorney-client privilege as such may exist" in order to put the executing officers on notice that special considerations are involved in the search

---

tion of [Maryland law] together with other fruits, instrumentalities and evidence of crime at this [time] unknown.
*Andresen*, 427 U.S. at 480–81 n. 10, 96 S.Ct. at 2748–49 n. 10. The Court finds it somewhat hard to reconcile the Supreme Court's citation of *Marron* for the proposition that nothing is to be left to the discretion of the executing officers, which is immediately followed by the Court's conclusion that the warrant in *Andresen* was not constitutionally infirm, even though it authorized the seizure of documents "showing or tending to show a fraudulent intent and/or knowledge."

This quoted statement appears to leave at least *some* discretion to the non-lawyer officers in charge of executing the warrant.

**14.** It is true that the *O'Connor* decision involved an interpretation of the Fourth Amendment to the Federal Constitution *and* Article I, § 10 of the Minnesota Constitution. *See O'Connor*, 287 N.W.2d at 405. This Court, however, cites that case for its analysis, logic and reasoning, and obviously not as controlling authority.

of confidential files belonging to an attorney, especially in a case like this, where the attorney is not the target of the investigation. *Hearty*, 644 P.2d at 313.

The defendant argues that *Andresen*, coupled with the fact that the executing officers never physically "searched" the premises in question, support its argument that the warrant was not invalid. As to the first contention, the Court is not entirely convinced that *Andresen* applies to the facts of this case since CWLA was not suspected of wrongdoing. Moreover, the fact that Rissler and other CWLA attorneys were on the premises when the officers sought to execute the warrant, thereby minimizing the officers' involvement in the search itself, is simply happenstance and is entitled to little, if any, weight.

The plaintiff's challenge is a facial attack on the warrant itself, and not a challenge to its execution. As the *O'Connor* Court stated, the primary concern was that the warrant empowered the officers to "rifle through [the attorney's] files until they found the documents for which they were searching," *O'Connor*, 287 N.W.2d at 403, even though there was someone present at the time. This concern is especially relevant in this context, where the warrant authorized a search of an attorney's confidential files containing privileged material as well as his own work product.

It has long been established that an attorney's work product is not discoverable. *See generally Hickman v. Taylor*, 329 U.S. 495, 509–14, 67 S.Ct. 385, 392–95, 91 L.Ed. 451 (1947). The policies underlying the work product doctrine are clear. In order for an advocate to effectively and zealously advance the interests of his or her client, it is essential that the attorney be able to perform his work with a certain degree of privacy, free from unnecessary and undesirable intrusions from opposing parties and their attorneys. Therefore, except under the most extreme circumstances,[15] an attorney's work product is immune from discovery.

The *Hickman* Court stated:

[h]ere is simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties. As such, it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.

*Id.* at 510, 67 S.Ct. at 393.

Additionally, the Court notes that because the aim of this warrant was to obtain a copy of R.F.'s statement, a subpoena *duces tecum* could have been used to achieve the same result. This would have avoided granting the executing officers a license to search and seize confidential records of Mr. Massey by allowing him to do so himself.[16]

The combination of these factors regarding this warrant leads this Court to the conclusion that the warrant was not particular. This Court is very skeptical and wary of law enforcement tactics that seek to obtain evidence through the back door, especially when the defendants in this case knew, or at a

---

15. FED.R.CIV.P. 26(b)(3), modeled after *Hickman*, provides that work product is discoverable only on a showing that "the party seeking discovery has substantial need of the materials in the preparation of the party's case *and* that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." (emphasis added).

16. The Court does not believe that *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), undercuts this possibility in this case. *Zurcher* held that a subpoena *duces tecum* was not a constitutional necessity in order to search the premises of a third party, which in that case, was a newspaper, who argued that the

First Amendment provided them with additional protection from searches and seizures. *Id.* at 560–63, 98 S.Ct. at 1978–80.

Aside from the fact that it is unclear whether *Zurcher* applies in this context since no First Amendment claims are at issue, *Zurcher* is still inapplicable for the simple reason that this case does not involve a search of the premises of a third party. If the officers had obtained a search warrant for R.F.'s house, and upon execution of the warrant, they learned that the evidence sought was in Mr. Massey's possession, then *Zurcher* might apply. But, in this case, CWLA is a primary party to this litigation, thus making *Zurcher* inapplicable to the case at bar.

minimum, should have known, that the plan that they were embarking on by seeking and authorizing the search of an attorney's confidential work product, would involve sensitive and confidential matters. The Court is primarily concerned with the fact that the defendants did not show any heightened concern over the nature and scope of the search that they were about to authorize and execute. It is clear that more could have been done to avoid any potential problems that might result from such a sensitive search, and that these defendants failed to do any of them. Therefore, under these circumstances, this Court concludes that the warrant was invalid and that the plaintiffs are entitled to a declaratory judgment to that effect.

### C. Prospective Injunctive Relief

#### 1. The Anti–Injunction Act

In 1793, Congress passed a statute that unconditionally provided that "[n]or shall a writ of injunction be granted to stay proceedings in any court of any state." Act of March 2, 1793, 1 Stat. 333, 335, ch. 22, § 5. The fundamental policies of federalism and comity embodied in that statute are still manifest today in the Anti–Injunction Act, 28 U.S.C. § 2283 (1988), the present-day successor to the 1793 statute. That statute, adopted in its present form in 1948, states that:

> [a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

While it is apparent that the Anti–Injunction Act abandoned the flatly prohibitory language of its predecessor, it is equally apparent that the exceptions created in the statute, as well as a well-recognized judicial exception,[17] have been narrowly construed by the Supreme Court. *See Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146, 108 S.Ct.

1684, 1689, 100 L.Ed.2d 127 (1988). The Court's rationale for narrowly construing the exceptions is that the statute reflects a Congressional decision "how to balance the tensions inherent" in our system of dual sovereignty, which the Court should defer to and not interfere with unless intervention is truly warranted. *Id.*

In *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the Supreme Court was squarely presented with the issue of whether 42 U.S.C. § 1983, which provides for a "suit in equity" to redress "the deprivation," under color of state law, "of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]," fell within the "expressly authorized" exception to the Anti–Injunction Act. The Court noted that:

> if a § 1983 action is not an 'expressly authorized' statutory exception, the anti-injunction law absolutely prohibits in such an action all federal equitable intervention in a pending state court proceeding, whether civil or criminal, and regardless of how extraordinary the particular circumstances may be.

*Id.* at 229, 92 S.Ct. at 2155. After a thorough summary of the history of the various versions of the anti-injunction law and the policies underlying both that law and § 1983, the Court concluded that "[s]ection 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century when the [original] anti-injunction statute was enacted." *Id.* at 242, 92 S.Ct. at 2162. Thus, the Court concluded that § 1983 was indeed an Act of Congress that fell within the scope of the "expressly authorized" exception of the Anti–Injunction Act. *Id.* at 243, 92 S.Ct. at 2162.

*Mitchum* is a case dealing with the issue of whether a federal court has *power*, in the constitutional sense, to enjoin state court proceedings under § 1983 and the Anti–Injunction Act.[18] It is critical, however, to

---

17. In *Ex parte Young*, 209 U.S. 123, 160–65, 28 S.Ct. 441, 454–56, 52 L.Ed. 714 (1908), the Supreme Court held that a federal cause of action in equity could be asserted in a federal court to enjoin a state official from violating the Constitution.

18. In the words of the *Mitchum* Court, "[t]oday we decide only that the District Court in this case was in error in holding that, because of the anti-injunction statute, *it was absolutely without power* in this § 1983 action to enjoin a proceeding pending in a state court under any circumstances

understand and differentiate the holding that a court has power to grant injunctive relief from the separate and distinct issue of whether a court should *exercise* that power in a particular case. Concerns over the proper role of the federal government vis-a-vis the sovereign state governments, which are embodied in the principles of federalism and comity, are the touchstones that must guide a federal court in determining whether to exercise the dormant power that it possesses to enjoin state proceedings. *See, e.g., id.* at 243, 92 S.Ct. at 2162; *Younger v. Harris,* 401 U.S. 37, 43–46, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971) (discussing the principles that should control the determination of whether a federal court should exercise its power to enjoin state proceedings).

Of course, the foregoing discussion presupposes that the party seeking federal injunctive relief has made the requisite showing that they have standing to maintain their suit.

### 2. The Doctrine of Standing

#### a. Background on the Law of Standing

Article III of the Constitution limits the jurisdiction of the federal courts to actual "cases" and "controversies." U.S. CONST. art. III, § 2. This limitation on the federal judicial power requires, *inter alia,* that a litigant have "standing" before he may invoke a court's power. As the Supreme Court has stated, "[i]n essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Thus, the doctrine of standing focuses a court's attention on the

party seeking to invoke the court's jurisdiction, and not the underlying issues that the party seeks to raise on the merits. *United States v. Richardson,* 418 U.S. 166, 174, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974) (citing *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)).

It is clear that the doctrine of standing consists of both constitutional components, stemming from the Article III case or controversy requirement, as well as several judicially self-imposed, or prudential, components. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Standing, like the other doctrines that center around Article III, relates to an idea "which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Id.* at 750, 104 S.Ct. at 3324 (citing *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir. 1983) (Bork, J., concurring)).[19]

At a minimum, the constitutional component of standing requires a litigant to demonstrate three things: that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), that the injury "fairly can be traced to the challenged action" and that the injury "is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976) (quoted in *Valley Forge Christian College v. Americans Unit-*

---

whatsoever." *Id.* 407 U.S. at 243, 92 S.Ct. at 2162 (emphasis added).

19. The "other doctrines" referred to, in addition to standing, are mootness and ripeness. It is generally accepted that all three of these doctrines are all compelled, at least in part, from the Article III case or controversy requirement. The theoretical issue posed is to what extent are these doctrines constitutionally compelled, a debate that remains unsettled to the present day. *Compare Honig v. Doe,* 484 U.S. 305, 329–32, 108 S.Ct. 592, 607–08, 98 L.Ed.2d 686 (1988) (discussing the interrelation between mootness and Article III) (Rehnquist, C.J., concurring) *with id.* at 332–42, 108 S.Ct. at 608–14 (Scalia, J., dis-

senting) (disputing Chief Justice Rehnquist's analysis of mootness and Article III); *see also Poe v. Ullman,* 367 U.S. 497, 522–39, 81 S.Ct. 1752, 1765–74, 6 L.Ed.2d 989 (1961) (discussing in part the interrelation of ripeness and Article III) (Harlan, J., dissenting). While Judge Bork also mentioned the political question doctrine, *see generally United States v. Nixon,* — U.S. —, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993), in his concurring opinion as a doctrine that relates to the proper role of an unelected judiciary, that doctrine does not have the same nexus to the case or controversy limitation as do mootness and ripeness.

ed for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

In order for an injury to suffice for purposes of standing, it must be an "injury in fact," United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973), that is a "distinct and palpable," Gladstone, 441 U.S. at 100, 99 S.Ct. at 1608, "concrete," Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974), "injury to a cognizable interest," Sierra Club v. Morton, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972), which includes aesthetic interests. Id.

■ In contrast, an alleged injury which is hypothetical in nature, or is abstract and based on mere "speculation and conjecture," Rizzo v. Goode, 423 U.S. 362, 372, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976), is insufficient to support a finding that this litigant has the necessary "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and therefore, the litigant would not have standing.

In addition to the constitutional components, the Supreme Court has fashioned several prudential considerations that would justify denying standing under certain circumstances. Those judicially-created, non-constitutional considerations are a general prohibition against asserting the rights of third parties, the rule barring adjudications of "generalized grievances" more properly redressed through the political branches of government, and the requirement that the plaintiff's complaint fall within the "zone of interests" protected by the law. See Allen, 468 U.S. at 751, 104 S.Ct. at 3324 (citations omitted).

In addition to proving a palpable, cognizable injury in fact, the litigant must also demonstrate that there is a causal link between the injury alleged and the defendant's conduct, and that the "exercise of the Court's remedial powers would redress the claimed injuries." Simon, 426 U.S. at 41, 96 S.Ct. at 1925; see also Duke Power Co. v. Carolina

Environmental Study Group, Inc., 438 U.S. 59, 74, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

■ Thus, the Supreme Court's cases on the subject of standing make it clear that an individual litigant needs to have a proper stake in the outcome of a controversy in order to properly invoke a federal court's jurisdiction. In the ordinary case for money damages, in a "suit at law," [20] standing is generally not an issue since the past injury alleged will be sufficient to insure the requisite concreteness and adversarial nature of the proceedings. The past wrong is ipso facto sufficient to establish the necessary personal stake in the outcome to meet the Article III case or controversy requirement. When, however, the relief sought is equitable relief in the form of an injunction, past injury will not be sufficient.

### b. Standing to Seek Injunctive Relief

#### i. Controlling Precedents

When a litigant seeks to invoke a federal court's equitable powers by seeking a prospective injunction in a suit "in equity," the standing inquiry changes. This is because the mere allegation of a wrong in the past does not logically support a finding that another wrong will happen again to the same individual in the future. Thus, absent some showing that there is a strong likelihood that this same injury will recur in the future against the same plaintiff, a litigant will not have standing to seek prospective injunctive relief since there would not be a live case or controversy in existence, and a court ruling on the merits of the claim would be dangerously close to exceeding its jurisdiction under Article III. A trilogy of Supreme Court opinions has explained the elements necessary to support injunctive standing and the underlying policies.

In O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the Supreme Court first dealt with this issue in the context of a suit by minority individuals who sued the county attorney and a county judge under § 1983 for engaging in a pattern and

---

**20.** The term "suit at law" is used in contrast to a "suit in equity," which is discussed below.

practice of conduct in their administration of the county's criminal justice system. Plaintiffs alleged that the defendants deprived the plaintiffs of numerous constitutional rights by continuously discriminating against African Americans by: (1) intentionally setting unattainable bond amounts according to an unofficial bond schedule; (2) knowingly setting higher sentences and imposing harsher conditions of release on minorities; and (3) requiring indigent minorities to pay for a trial by jury even though they could not afford it. The plaintiffs sought only prospective injunctive relief prohibiting the defendants from continuing to violate their constitutional rights in the future. Although the district court dismissed the case on the grounds that the defendants were immune from suit, the Court of Appeals reversed, holding that if no adequate remedy at law was available, then the plaintiffs were entitled to injunctive relief if they succeeded on the merits of their claims. The Supreme Court granted certiorari, but never reached the merits of the case. The Court concluded that "[t]he complaint failed to satisfy the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of the federal courts must allege an actual case or controversy." *Id.* at 493, 94 S.Ct. at 675. The Court, albeit implicitly, distinguished its prior standing cases which involved suits for damages, stating that:

> [p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects.

*Id.* at 495–96, 94 S.Ct. at 676. While acknowledging that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *id.* at 496, 94 S.Ct. at 676, they are, by themselves, insufficient to support the constitutional requirement of a case or controversy. In *O'Shea*, the Court concluded that the plaintiffs had failed to show any imminent prosecutions against them in the future, and therefore, "the threat of injury from the alleged course of conduct they attack[ed] [was] simply too remote to satisfy the case-or-controversy re-quirement and permit adjudication by a federal court." *Id.* at 498, 94 S.Ct. at 677.

Finally, the *O'Shea* Court went on to delineate the parameters of what was necessary to support a finding of standing in the context of prospective injunctive relief. Citing *Younger*, 401 U.S. at 43–44, 91 S.Ct. at 750, the Court stated that it had recently reaffirmed the

> basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, *when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.*

*O'Shea*, 414 U.S. at 499, 94 S.Ct. at 677 (emphasis added). Moreover, given that this case involved a request for an injunction against state officials, the Court, noting the concerns over federalism discussed in cases like *Younger* and *Mitchum*, went on to state that in order for a plaintiff to have standing to seek an injunction, there must be a showing of irreparable injury "which is both 'great and immediate.'" *Id.* (citing *Younger*, 401 U.S. at 46, 91 S.Ct. at 751). This very high showing is therefore a necessary prerequisite to insure that a live case or controversy exists, and must be demonstrated before a federal court may even consider issuing an injunction against state officials. It bears repeating that *Mitchum* only held that the federal courts do, in theory, have the constitutional authority to issue an injunction. It clearly did not address when and under what circumstances that power should be exercised, nor did it, or could it, purport to eliminate the constitutional requirement that a case or controversy exist, a concept that is embodied in *O'Shea.*

The principles enunciated in *O'Shea* and *Younger* were reaffirmed in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). *Rizzo*, a factually similar case to *O'Shea*, reiterated the principle that past wrongs, in and of themselves, do not amount to the real and immediate threat of injury that is necessary to establish a genuine case

**810**

or controversy. *Rizzo*, 423 U.S. at 372, 96 S.Ct. at 604.

*Lyons* was a case involving allegations that Los Angeles police officers unnecessarily, unjustifiably and routinely applied brutal chokeholds to persons stopped for ordinary traffic violations. The plaintiffs sought an injunction against the Los Angeles police department, but the Court concluded that Lyons did not have standing to seek injunctive relief since his allegations that he feared he might be subject to this chokehold again were deemed too speculative and conjectural. Moreover, after the Court in *Lyons* concluded that Lyons was unable to establish his standing to seek injunctive relief, the Court went on to state that:

> [w]e decline the invitation to slight the preconditions for equitable relief; for as we have held, recognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the State's criminal laws in the absence of irreparable injury which is both great and immediate.

*Lyons*, 461 U.S. at 112, 103 S.Ct. at 1670 (citations omitted). Federal courts were advised to recognize "[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Id.* (citing *Stefanelli v. Minard*, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951)).

### ii. *Invocation of this Court's Equity Jurisdiction*

 With these principles in mind, this Court is now faced with the difficult task of applying them to the case at bar. After a thorough review of the record in this case, the Court has concluded that the plaintiffs have failed to meet their burden of demonstrating that they are suffering from a real and immediate threat of irreparable injury, and therefore, this Court is forced to conclude that plaintiffs have no standing to seek prospective injunctive relief in this case.[21]

Plaintiffs have clearly alleged that the defendants have engaged in a pattern of behavior by threatening to exercise their powers as governmental officers to obtain search warrants and to subpoena documents from the plaintiffs' law offices. There are, however, no allegations that support a finding that the defendants have a present plan to continue with this type of behavior. Essentially, plaintiffs' contentions are the type of speculative, conjectural injury that the Supreme Court has said are insufficient to create a true case or controversy in *O'Shea*, *Rizzo* and *Lyons*. These allegations are not entirely irrelevant; the Supreme Court has stated that while they are probative, they cannot, without more, support a finding that the plaintiffs have suffered and continue to suffer the type of injury necessary to establish standing to seek injunctive relief.

This conclusion is supported by the fact that no claims of any further harassment have been alleged to have occurred since this lawsuit was filed almost six months ago. While the Court can sympathize with the plaintiffs' plight and their psychological fear that this behavior might recur, the plaintiffs have simply failed to meet their burden under *O'Shea* and its progeny. Under those precedents, therefore, this Court must conclude that the plaintiffs do not have standing to seek injunctive relief based on their failure to demonstrate any immediate irreparable harm.[22]

Given this Court's disposition that the plaintiffs lack standing to seek a prospective

---

21. At oral argument, counsel for the defendants strenuously argued that summary judgment on the claim for injunctive relief should be granted since it was clear that there is an adequate remedy at law. They contended that there was an adequate remedy at law since a separate lawsuit, file number 93-CV-0225-J, was filed in this Court seeking money damages. This argument fails to acknowledge a critical distinction between these two cases: they involve different plaintiffs. The second lawsuit was filed by L.H. against these defendants. L.H.'s claim for damages, however, is in no way relevant to whether CWLA, the plaintiff in this case, has an adequate remedy at law. Therefore, this argument does not support their position.

22. Moreover, even if the requisite injury could be demonstrated by the plaintiffs, it is not clear that they have shown that there is no adequate remedy at law, the second requirement necessary to support standing.

It has often been stated that "the touchstone for equity is the lack of an adequate legal remedy." *See* 30A C.J.S. *Equity* § 18 (1992) (footnote omitted). While not necessarily susceptible to a

injunction, the Court need not resolve the issue of whether an injunction would be proper in these circumstances, an issue first addressed in *Younger.*

### D. *Conclusion*

The conduct of the law enforcement authorities at issue here walks the fine line between governmental abuse and misuse of the awesome powers that are vested in it and legitimate law enforcement techniques. This Court cannot, has not, and will not condone this type of behavior. This Court sits as an impartial decisionmaker precisely to protect against injustices and erosion of the constitutional rights of the citizens of this country. Law enforcement officials must act with reasonable diligence and care before invoking the heavy hand of government, especially in cases like this, where the reasons offered by the enforcement authorities do not justify resorting to such drastic means when sensitive and delicate matters are concerned.

Nonetheless, this Court is at the same time bound to follow and uphold the Constitution and to follow the binding interpretations of that document that the Supreme Court declares to be the law of the land. Thus, while this Court has concluded that the plaintiffs are entitled to a declaratory judgment that their Fourth Amendment rights were violated, *O'Shea* and its progeny militate against their position that they have standing to seek a prospective injunction against further constitutional violations.

**THEREFORE,** it is,

**ORDERED** that Defendants' Motions for Summary Judgment be, and the same hereby are, **GRANTED IN PART AND DENIED IN PART** in accordance with this order. It is further

**ORDERED** that the plaintiff's motion for a declaratory judgment be, and the same hereby is, **GRANTED.**

precise definition, it has been said that an "adequate remedy at law" is a legal term of art which has a relatively settled meaning in equity jurisprudence, and that it refers to the remedy of monetary damages in a civil action. *See id.* (footnote omitted). A finding that no adequate remedy at law exists as a prerequisite to the invocation of equitable jurisdiction is based on the fact that equity has always been viewed as a form of remedial justice which was only to be invoked under "extraordinary" circumstances. *Id.*

42 U.S.C. § 1983 (1988), the basis for this lawsuit, expressly states that "[e]very person who, under color of [state law] ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured *in an action at law,* suit in equity, or other proper proceeding for redress...." This statute clearly and unequivocally provides for money damages, a remedy at law, as well as equitable relief, in order to redress alleged constitutional violations by state actors. *Cf. Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971) ("we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the [federal] agents' violation of the [Fourth] Amendment.").

It is, however, accepted that when both legal and equitable remedies are available, "the exercise of equitable powers is inappropriate if there is an adequate remedy at law." *Moore v. Sims,* 442 U.S. 415, 425, 99 S.Ct. 2371, 2378, 60 L.Ed.2d 994 (1979). Plaintiff's complaint in this case stated a claim action under § 1983 and sought declaratory relief and injunctive relief, but not damages. Plaintiffs *could* have, however, sought damages if they wanted to. It is illogical to conclude that because the plaintiffs failed to utilize or take advantage of an existing remedy at law, then no adequate remedy at law existed. As the Supreme Court has stated, if "the absence of a remedy at law ... is due to [plaintiffs'] failure to pursue that remedy, then equity will not intervene ... [t]he inadequacy of [plaintiffs'] legal remedy would then be due to his own choice not to pursue it." *Commissioner of Internal Revenue v. Shapiro,* 424 U.S. 614, 634 n. 15, 96 S.Ct. 1062, 1074 n. 15, 47 L.Ed.2d 278 (1976); *accord Smaldone v. Kurtz,* 450 F.Supp. 1138, 1140 (D.D.C.1978).

It is clear then that equity does not require a plaintiff to actually invoke a remedy at law; as long as an adequate remedy at law *exists,* then equity jurisdiction may not be invoked. The closer question here is whether this remedy can be said to be "adequate." An adequate legal remedy at law has been said to be one that is as clear, full and complete as the remedy in equity, and which is "equally prompt and certain and in other ways efficient." *See American Life Ins. Co. v. Stewart,* 300 U.S. 203, 214, 57 S.Ct. 377, 380, 81 L.Ed. 605 (1937) (citations omitted). This Court is not convinced that a damages remedy would be adequate under the facts of this case, but this issue need not be resolved based on the Court's disposition that the necessary injury has not been shown.